Lonnie BROWN, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–08–00242–CR.

Court of Appeals of Texas,
Beaumont.

Submitted March 5, 2009.

Decided Sept. 23, 2009.

Discretionary Review Refused
Dec. 16, 2009.

Joseph C. "Lum" Hawthorn, Zack Hawthorn, Hawthorn & Hawthorn, P.C., Beaumont, for appellant.

Tom Maness, Rodney D. Conerly, Special Prosecutors, Crim. Dist. Atty's, Beaumont, for state.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

CHARLES KREGER, Justice.

Lonnie Brown was indicted for the murder of Justin Slider. The cause was tried to a jury, which was instructed on the lesser-included offenses of manslaughter and criminally negligent homicide upon the State's request and over Brown's objections. Brown's defense was that he shot Slider as an act of self-defense. The jury, however, found Brown guilty of the lesser-included offense of manslaughter. Following the punishment hearing, the jury assessed Brown's sentence at confinement for four years in the Texas Department of Criminal Justice, Correctional Institutions

Division, along with a fine in the amount of $10,000. Brown's direct appeal to this Court raises four issues:

1. The trial court erred when it granted the State's request to submit a charge on the lesser-included offenses of manslaughter and criminally negligent homicide.

2. The evidence is legally insufficient to support the verdict of guilty for the offense of manslaughter.

3. The evidence is factually insufficient to support the verdict of guilty for the offense of manslaughter.

4. The trial court abused its discretion when it allowed the State to use Brown's grand jury testimony that was not produced to the defense in violation of the court's pretrial discovery order.

We will first address the complaints concerning evidentiary sufficiency.

## LEGAL AND FACTUAL SUFFICIENCY

■ Initially, we note that Brown's portrayal of the appellate standard for reviewing the record for legally sufficient evidence—equating it to determining the "quantum of evidence the trial court would need for the submission of the lesser-included offense"—is not correct. The Court of Criminal Appeals has held the test for giving an instruction on a lesser-included offense "is quite different" from the test for legal sufficiency of the evidence to support a conviction. *Hampton v. State*, 165 S.W.3d 691, 693 (Tex.Crim. App.2005). The Court described each standard thusly:

In deciding whether evidence is legally sufficient, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The

test used to determine whether a jury-charge instruction on a lesser-included offense can be given has two prongs: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged; and (2) some evidence must exist in the record that would permit a rational jury to find the appellant guilty of the lesser offense, but not guilty of the greater offense. This two-prong test applies regardless of whether the instruction is requested by the State or by the defendant.

*Id.* at 693–94 (footnotes and internal quotation marks omitted).

As the record in *Hampton* demonstrated, the evidence was legally sufficient to support the conviction for the lesser-included offense of sexual assault but did not justify the submission of the lesser-included offense instruction because the evidence did not show that the defendant was guilty *only* of the lesser-included offense. *See id.* We therefore disregard Brown's argument and authorities under his second (legal sufficiency) and third (factual sufficiency) issues to the extent those issues adopt the argument and authorities used to support his first issue complaining of the lesser-included offense instruction.

As mentioned above, in reviewing a record for legally sufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Young v. State*, 283 S.W.3d 854, 861 (Tex.Crim. App.2009). This standard incorporates the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. This translates into

the reviewing court's determining whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most favorable to the verdict. *Young*, 283 S.W.3d at 861–62 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007)). In assessing all the evidence under the *Jackson* standard of review, the reviewing court must consider all evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim.App. 2001). In a jury trial, the jury, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given the testimony and may accept or reject all or any part of a witness's testimony. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim.App.2008); *Moore v. State*, 935 S.W.2d 124, 126 (Tex.Crim.App.1996). Reconciling conflicts in the evidence is within the exclusive province of the jury. *Moore*, 935 S.W.2d at 126.

In the instant case, Brown's evidentiary complaint hinges on the proof of his culpable mental state. The gist of his position can be found in the following argument taken from his brief:

> [Brown's] testimony throughout the trial was that his actions of firing the weapon at Slider were intentional to prevent [Slider's] continued unlawful attack. Even the witnesses called by the State testified consistently that [Brown's] actions were intentional and knowing. Additionally, there was testimony that Brown had owned numerous firearms in his lifetime, had taken a gun safety course, had a permit to carry a concealed firearm and was a licensed fire-

arms dealer and collector.... He also had to have known his gun was working properly because immediately before he had to protect himself from Slider, his gun had incapacitated Slider's pet pit bull.

Brown's complaint is that his manslaughter conviction is unsupported by any evidence indicating his actions in firing his handgun, which resulted in the death of Justin Slider, were done recklessly. Brown posits that all the proof at trial points to the shooting of Slider being an intentional, not a reckless, act.

Under the facts of the instant case, the elements of manslaughter differ from murder only as to the requisite culpable mental state. *Compare* Tex. Pen.Code Ann. § 19.04(a) (Vernon 2003) *with* Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). Manslaughter requires proof the accused acted recklessly. *Id.* § 19.04(a). "A person acts recklessly, or is reckless, with respect to ... the result [1] of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the ... result will occur." Tex. Pen. Code Ann. § 6.03(c) (Vernon 2003). Recklessness has been described as involving "conscious risk creation." *See Williams v. State*, 235 S.W.3d 742, 755 (Tex.Crim.App. 2007); *Stadt v. State*, 182 S.W.3d 360, 364 (Tex.Crim.App.2005); *Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Crim.App.1975).

On the other hand, "[a] person acts *intentionally*, or with intent, with respect to ... a result of his conduct when it is his conscious objective or desire to ... cause the result." Tex. Pen.Code Ann. § 6.03(a) (Vernon 2003) (emphasis added). "A person acts *knowingly*, or with knowledge, with respect to a result of his conduct

---

1. Manslaughter is a "result of conduct" crime and, as such, the actor's recklessness must go to the conduct causing the death. *See Schroeder v. State*, 123 S.W.3d 398, 400–01 (Tex. Crim.App.2003); *Gilbert v. State*, 196 S.W.3d 163, 166 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd).

when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b) (Vernon 2003) (emphasis added). When committing an offense either "intentionally" or "knowingly," an actor exhibits a higher degree of criminal culpability than when committing an offense "recklessly." *See id.* § 6.02(d) (Vernon Supp. 2008); *Guzman v. State,* 188 S.W.3d 185, 190 (Tex.Crim.App.2006) ("A reckless *mens rea* is a less culpable state of mind than that of an intentional *mens rea.*").

We agree there was evidence indicating the shooting was an intentional act by Brown. The State's first two witnesses, Deniece Haskins, and Chasity Stone,[2] both eye-witnesses, so testified. In reviewing their testimony in the light most favorable to the verdict, we must presume the jury rejected their versions of the events. What is more, Ms. Haskins' and Ms. Stone's testimony was not the only version of events the jury heard. Brown testified in his own defense and was questioned in great detail concerning the circumstances surrounding the shooting by both his trial counsel and by the State.

According to Brown, on the day in question, he drove his golf cart over to Slider's and Stone's home to talk to them about one of their pit bull dogs getting loose and chasing another resident of the mobile home park. At the time, Brown carried a handgun concealed in the waistband of his pants as was his habit. Brown had a concealed handgun permit and for the past several years had been carrying a handgun for protection, especially while on the premises of his mobile home and RV parks. Upon arriving at Slider's home, Brown testified he was attacked by one of Slider's pit bull dogs, bitten twice, and was forced to shoot the dog to end the attack. Seconds later, Stone exited her home,

angrily grabbed Brown by the arms and shouted, "You son of a b* * * *, you shot my dog. You shot Precious. You shot my dog[.] ..." Brown pushed Stone off him at which point she turned her attention to the dog lying on the ground.

Shortly after that, Slider came "flying out of the trailer," and stated to Brown, "You shot my dog, you son of a b* * * *. You shot my dog.... I'm going to kill you.... You shot Precious. I'm going to kill you." Brown proceeded to describe the first part of his confrontation with Slider as follows:

> [Brown:] And [Slider] come flying out of the trailer, rushed out, and grabbed me and started hitting me in the head. When he come off that trailer, he had his fist back and he hit me. And I ducked down. I backed up, but there was a car there. I backed up against the car and I put my hands up—I had the gun—still had the gun in this hand (indicating). I put my hands up like this (indicating) to keep him from hitting me in the face. And he hit me. I bent down and he hit me in the top of the head right there (indicating). It seemed like every time he hit me he was saying, "I'm going to kill you, you son of a b* * * *. You killed my dog. I'm going to kill you...."
>
> ....
>
> [Trial Counsel:] And so—I mean, he came at you like what? Describe that to the jury.
>
> [Brown:] Like a—like a crazy person. I never seen anybody that upset and mad about anything. I couldn't talk to them. They wouldn't talk. I mean, they just—
>
> [Trial Counsel] How much time was there from the time he came to that

---

2. Ms. Stone was Justin Slider's life companion and shared a mobile home located in

Lonnie Brown's mobile home park at the time of the shooting.

door and the time he hit you in the head?

[Brown:] Maybe three seconds, if that much.

Brown then described for the jury his fatal encounter with Slider:

[Trial Counsel] And so, y'all are struggling. I mean, did he have any momentum when he hit you? Did his body hit you, too?

[Brown] Yes, sir. He come off—inside the trailer, which is about 2 foot off the ground. And I wasn't but, like, maybe 4 or 5 foot. And I was close. And he come flying out—rushing out there. And his body momentum knocked me back against the car, which is about a foot and a half, 2 foot behind me. That's the only thing that kept me from going on the ground, was that car. And he was steady beating me in the head and the face.

[Trial Counsel:] And then you were struggling. Did he have ahold of the hand you had the weapon in?

[Brown:] Yes. When I put my hands up like that, he grabbed me like that (indicating).

[Trial Counsel:] And y'all were then doing what?

[Brown:] Moving around. He was hitting me. I was moving around. I had my hand up like that (indicating).

[Trial Counsel:] Did you grab him?

[Brown:] No. I grabbed his t-shirt. I grabbed the only thing I could get, was his shirt; and I pulled it.

[Trial Counsel:] So, what were you trying to do to him?

[Brown:] Keep him off of me is what I was trying to do, just keep him off of me and keep him from getting the gun. I was concerned about him getting the gun.

[Trial Counsel:] All right. Did the gun go off?

[Brown:] Yes, sir, the gun went off. And I had it like this. And when it went off, I had him by the shirt and he had me by the hand (indicating).

[Trial Counsel:] You were able to move the gun around?

[Brown:] Yeah, I could still move my wrist, because he had me down here; and I got claw marks in my arm there where his nails cut into my arm (indicating).

[Trial Counsel:] You don't know whether they were—they weren't there when you started, and they were after?

[Brown:] That's right.

[Trial Counsel:] And how they got there, you know—y'all were tussling over the gun, right?

[Brown:] Yes, sir.

[Trial Counsel:] And then it went off?

[Brown:] That's correct.

[Trial Counsel:] And what happened next?

[Brown:] Well, when it went off, he didn't let go of me. He slacked up a little bit. I guess it startled him. It startled me, too. I was able to pull the gun back down by my side. Because like I said, when he first run out there, I had my hands up like this (indicating). And he grabbed that gun hand and was beating me in the head. And I had this up here (indicating). And when the gun went off, I jerked the gun back down here (indicating).

And when the gun went off, I jerked the gun back down here (indicating). And when I did, I shot it two more times.

[Trial Counsel:] And how—what was the sequence of the shell—I mean, the firing?

[Brown:] There were—all three of them was close together; like pow, pow, pow.

[Trial Counsel:] And after the third shot, what happened, if anything?

[Brown:] He relaxed and let me go and turned around and walked about one step and fell down.

[Trial Counsel:] Did you know he was hit bad?

[Brown:] I knew he was hit bad. I felt like—I didn't know where he was hit. I couldn't tell. I didn't see any blood on him. I didn't know where he was hit. I just know he quit beating on me, and he quit trying to get the gun.

When asked what he did immediately after the shooting, Brown provided the following description:

[Brown:] I got enough air to go over there and get on the golf cart. And I tried to put the—I sat down and tried to figure out what had happened.

I mean, all this happened in—like in 20, 30 seconds. From the time the dog got me until the whole thing was over with, it was like 20, 30 seconds at the most.

I was sitting there trying to figure out what in the world has gone on here, you know, what happened. And then I took the gun—I still had the gun in my hand. And I pulled my belly up—you know, I got a gut. I tried to put that gun in that holster, and my hand wasn't working— my left hand. That's when I looked down there, and I was—blood was going everywhere. I had a big ole hole in my hand. I realized during that—

[Trial Counsel]: May I approach, You Honor?

THE COURT: Yes, sir.

[Trial Counsel:] Defendant's Exhibit No. 2 I'm showing you. That has already been introduced into evidence. Is that the condition your hand was in?

[Brown:] Yes, sir. That hole right there was about the size of a 50-cent piece (indicating).

[Trial Counsel:] All right. Let me— you can just set it down for a second.

You were sitting on the golf cart. Was your hand—state whether or not it was bleeding.

[Brown:] Oh, it was bleeding, yes, sir. In fact, when I saw what condition it was in, I stuck it out over the side of the golf cart to keep from getting blood all over the golf cart.

. . . .

[Trial Counsel:] All right. What did you do next?

[Brown:] I put the gun on the seat of the golf cart. I grabbed the—we have radios out there that we talk back and forth with and communicate with.

I called my wife; and I said, "Get— call 911. Get an ambulance out here." I said, "This young man is hurt bad." And I said, "Get the sheriff out here. . . ."

Over the course of his testimony, Brown would be asked to provide further details of the above-described events by both the State and by his trial counsel. At one point during the State's cross-examination, the following exchange took place:

[State:] You let Justin Slider hit you five times, though, before you killed him, right? Is that your testimony?

[Brown:] He hit me five or six—four, five, six times.

[State:] And at the time that the first shot went off, he had you by the wrist; is that your testimony?

[Brown:] I think so, yes, sir. I think so.

[State:] Well, is it—was that your testimony a few minutes ago or not?

[Brown:] Yes, sir, he had me by the wrist.

[State:] Why are you qualifying it now, Mr. Brown?

[Brown:] Well, I'm going to tell you—

[State:] Why are you qualifying it now?

[Brown:] Can I answer that?

[State:] Certainly.

[Brown:] Okay. This thing that happened in 20, 30 seconds from the time the dog got on me two times to the time I shot the dog. The woman come out and attacked me. The man come out and attacked me. All this was in a 20, 30–second period of time. Now, if you have ever been under that type of stress—

[State:] Okay. Now, you've answered the question.

[Brown:] Yeah.

[Trial Counsel]: He hasn't answered, Your Honor. He hadn't let him fully answer. He answered the question why; and that opens the door to him to answer fully, as long as he wants to.

THE COURT: You can answer the question, Mr. Brown.

[Brown:] When he come out of that trailer and jumped me and told me he was going to kill me, I believed him. I believed exactly what he told me.

He grabbed my gun hand, and he was twisting my hand. And I was trying to get the gun back away from him. And he was steady beating me in the head with his right hand.

And I know the young man was right-handed, whether Ms. Stone knows that or not, because he was beating me with his right hand. So, I'm convinced he was right-handed.

Now, where he had his hand during that 20 or 30 seconds, I can't tell you exactly each place he had me. I know he was trying to control the gun; and I was trying to control it because I did not want him to get it. I knew he was going

to kill me if he got that gun, because he told me he was going to kill me. He told me he was.

So, he might have had my wrist one time, my hand, the gun. He was steady grabbing and jerking on me, and I was steady trying to get away from him.

I didn't want to hurt the dog or him or her or nobody. I didn't go over there for that. I didn't want that. But I also did not want to die either. And when it got right down to it, it was either him or me. And I'm sorry that he got killed, but I'm not sorry I'm alive.

Later, on redirect examination, more questions about the particulars of the shooting were put to Brown in hopes of further clarifying the facts. A pertinent exchange is reflected in the record as follows:

[Trial Counsel:] All right. And were you trying to—what were you trying to do at that point, when he came out of there and attacked you?

[Brown:] Trying to get the gun away from him.

. . . .

[Trial Counsel:] What were you doing?

[Brown:] I was trying to protect myself and keep the gun away from him and trying to live, trying to survive. I was trying to stay alive. I was trying to stay alive.

[Trial Counsel:] When you get into a fight or you get into a critical situation like that, what do you do, sir?

[Brown:] You just react. You don't think every little detail. I mean, there is no way that your mind can comprehend. I had to go sit down and think about what had happened. I couldn't comprehend what had went on.

I just knew the dog attacked me, the young lady jumped me, the young man come out and said he was going to kill

me and tried to take the gun—control the gun, take it away from me. And I was fighting. I was just trying to survive. I was just trying to fight and stay alive.

Physical evidence relating to the autopsy results, to DNA analysis, and to bullet trajectory tended to support Brown's testimony describing the two men positioned close together when at least one, and possibly two, of the three shots were discharged by Brown. For example, the forensic pathologist testified that Slider had a gunshot wound that entered his neck and exited the lower rear portion of his head. Additionally, below the entrance wound there were abrasions and evidence of stippling, which is burned and unburned particles of gunpowder that mark the skin when a handgun is discharged at close range, not exceeding twenty-four inches. This is consistent with both men being positioned close together and struggling over the gun when Brown discharged it. The pathologist further indicated that both bullets that struck Slider passed completely through his body.

DNA testing of a stain on the shirt Slider was wearing at the time of the shooting indicates the presence of Brown's DNA along with Slider's. The laboratory analyst described the stain as "apparent blood." This, too, would match-up with Brown's depiction of events describing the struggle—that Brown had grabbed Slider by the shirt and one of the shots blew a hole through Brown's hand, presumably staining Slider's shirt with Brown's blood.

The sheriff's department investigation indicated that Brown fired four times; one bullet killing the pit bull dog, and two bullets and a shell casing found inside Slider's mobile home. When asked to interpret the physical evidence in light of his encounter with Slider, Brown testified as follows:

[Brown:] When he jumped on me and the gun was fired, the shell went through my hand and took out a half inch of my thumb bone and left a piece of the projectile in my hand. And the remainder of the shell went through his neck and out the back. It left a piece of the shell—the shell was so spent going through my hand. It left a piece of the metal on his t-shirt and blowed blood and bone out of my hand on his clothing. And they call it stippling—powder burn—I don't know. Powder burns from the end of the gun was all over his shirt and upper chest.

 . . . .

[Trial Counsel:] And then [the gun] went off again—

[Brown:] Yes, sir.

[Trial Counsel:] —very shortly thereafter?

[Brown:] That's right.

[Trial Counsel:] And where did that bullet go, do you think?

[Brown:] I think it went in the trailer.

[Trial Counsel:] Do you think it missed?

[Brown:] Yes, sir, it missed him. I think it missed him and went into the trailer. One of them hit the trailer door. And I think the door was standing open and the shell hit that door. And the door was at an angle. And when it hit it, it swung the door shut.

[Trial Counsel:] Where did the next shot go?

[Brown:] It went through the door.

[Trial Counsel:] All right. Where did the next shot go? When it came out of the end of that gun, where did it go?

[Brown:] It went through him, went in about—in this area here (indicating) and come out—

[Trial Counsel:] Well, it went in, the doctor testified, 1 inch above the navel and 1 inch to the left side.

[Brown:] Yes, sir.

[Trial Counsel:] And it came out a little bit on the right side. And it didn't hit anything, right?

[Brown:] It didn't hit anything? It hit him.

[Trial Counsel:] Well, I mean, it didn't hit any bone or anything?

[Brown:] No, sir.

[Trial Counsel:] It went straight through, the doctor said?

[Brown:] No, sir.

[Trial Counsel:] You heard that?

[Brown:] Yes, sir.

[Trial Counsel:] And you think that bullet went where?

[Brown:] Went into the trailer.

[Trial Counsel:] Went through the door?

[Brown:] Yes, sir.

[Trial Counsel:] That's the one they found?

[Brown:] Yes, sir.

[Trial Counsel:] That would have been the one that was pristine?

[Brown:] Yes, sir.

[Trial Counsel:] In your opinion, the one that hit the facing of that door, what would it have done to it?

[Brown:] It would have distorted it.

[Trial Counsel:] Fragmented it?

[Brown:] Yes, sir. You can see where it went through, like, two thicknesses.

Aside from generally supporting Brown's version of the shooting, the physical evidence tended to discredit eyewitness testimony directly stating, or inferring, that Brown shot Slider while Slider was lying on the ground, and stating that the first shot that hit Slider was the shot to the stomach.

The State indicted Brown for murder and advocated that Brown intended to cause Slider's death at the time of the shooting. In other words, the State's theory was that, in discharging his weapon as he did, Brown shot intending to kill. The State presented evidence consistent with this theory.

Brown centered his case entirely on self-defense, and presented evidence to this effect. Brown received a self-defense instruction from the trial court. The defensive evidence stressed lack of any prior animosity between Brown and Slider, Brown's sincere concern for Slider's condition immediately following the shooting, and Brown's remorse for having shot the young man. The defense also emphasized Slider's aggression and threats to kill Brown in the immediate aftermath of the shooting of the pit bull dog along with Slider's lack of awareness of the dog's attack on Brown, and that the circumstances of the struggle caused Brown to reasonably fear for his life and thus to act in the only way left to him to neutralize the immediate threat—by discharging the handgun until the immediate threat ceased.

 In the light most favorable to the evidence, a rational jury could have concluded Brown's discharge of the handgun during the struggle was a voluntary act, but was not done with intent to cause Slider's death. *See* TEX. PEN.CODE ANN. § 6.03(a) ("A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result."); *Dowden v. State,* 758 S.W.2d 264, 270 (Tex. Crim.App.1988) (In determining if a homicide is criminal, the question is whether the accused acted voluntarily and with the requisite culpable mental state). More-

over, a rational jury could have found Brown's actions reckless beyond a reasonable doubt. "Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Williams*, 235 S.W.3d at 751. An actor's culpable mental state is generally shown by circumstantial evidence. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App.1991). Culpability may be inferred from the acts, words, and conduct of the accused. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App.1995). Brown's testimony clearly indicates he was aware of the requisite risk that being shot with a handgun poses to an individual. Brown's testimony also indicates he consciously disregarded the substantial risk that discharging his handgun at that point in time could result in Slider's either being killed or sustaining serious bodily injury. Brown obviously felt justified in consciously disregarding the risk and repeatedly discharging the handgun. However, the jury felt otherwise as it rejected his self-defense issue and convicted him of manslaughter. The evidence is legally sufficient to support the jury's verdict.

Additionally, because Brown does not contend the evidence taken as a whole is legally insufficient to sustain his conviction, we must discuss another independent legal basis for overruling this issue. Brown insists on appeal that all the trial evidence indicates he intentionally caused Slider's death, albeit justifiably, and that no evidence of recklessness exists in the record to sustain his manslaughter conviction. In *Wasylina v. State*, 275 S.W.3d 908, 909 (Tex.Crim.App.2009), the defendant was convicted of criminally negligent homicide after being indicted for manslaughter, with the lesser-included offense instruction being submitted to the jury over the defendant's objection. On appeal, the defendant raised charge error contending there was no evidence he had act-

ed with criminal negligence. *Id.* The court of appeals agreed, but instead of reversing and remanding for a new trial, it rendered a judgment of acquittal. *Id.* After clarifying that the appellate standards for determining legal sufficiency and for determining whether to instruct on a lesser-included offense are "quite different," the Court of Criminal Appeals held that the court of appeals erred in rendering a judgment of acquittal. *Id.* at 909–10. We reproduce the Court's analysis in pertinent part:

> An offense is denominated as "lesser-included" precisely because proof of the lesser offense is "included" in the offense described in the charging instrument. If the State proves the charged offense, it necessarily proves all lesser-included offenses.
>
> . . . .
>
> The Legislature has specifically designated an offense as "lesser included" if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." [citing Tex.Code Crim. Proc. Ann. art. 37.09(3) (Vernon 2006) and Tex. Pen. Code Ann. § 6.02(d) ] Furthermore, the Legislature has also prescribed that "[p]roof of a higher degree of culpability than that charged constitutes proof of the culpability charged." [citing Tex. Pen.Code Ann. § 6.02(e) ] Consistent with these statutes, we have held that criminally negligent homicide is a lesser-included offense of manslaughter. The court of appeals erred in holding that the State failed to prove criminal negligence because it proved only recklessness.

*Id.* at 910 (footnotes omitted). By footnote, the Court concluded:

> We express no opinion on whether the evidence was legally sufficient to show

manslaughter or its constituent culpable mental state of recklessness. We simply hold that the court of appeals erred in concluding that proof of recklessness (and thus manslaughter) would not be sufficient to embrace proof of criminal negligence (and thus criminal negligent homicide).

*Id.* n. 14.

In the instant case, Brown asserts the same basis for relief as in *Wasylina*—no evidence of the lesser-included culpable mental state for which he was convicted, only evidence of the greater culpable mental state for which he was acquitted by the jury. We read the court's opinion in *Wasylina* as addressing an issue of evidentiary sufficiency, and not jury charge error. Thus, assuming for the sake of argument that there was only proof Brown intentionally or knowingly caused Slider's death as Brown contends, then legally sufficient proof also existed to sustain a conviction for the lesser-included offense of manslaughter. *See id.* We overrule issue two.

Issue three complains of factually insufficient evidence to sustain the conviction. In a factual sufficiency review, the evidence is examined in a neutral light. *Steadman v. State,* 280 S.W.3d 242, 246 (Tex.Crim.App.2009). Evidence can be factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *See Roberts v. State,* 220 S.W.3d 521, 524 (Tex.Crim.App.2007); *Watson v. State,* 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006). A reviewing court may not find the evidence factually insufficient simply because there are "reasonably equal competing theories of causation." *Steadman,* 280 S.W.3d at 247 (quoting

*Goodman v. State,* 66 S.W.3d 283, 287 (Tex.Crim.App.2001)). A reversal for factual insufficiency should not occur when the greater weight and preponderance of the evidence actually favors conviction. *Id.; Watson,* 204 S.W.3d at 417. A "high level of skepticism about the jury's verdict" is required before an appellate court may reverse due to factual insufficiency. *Watson,* 204 S.W.3d at 417.

As mentioned previously, the State elicited testimony from two of the three people known to have witnessed the shooting—Deniece Haskins and Chasity Stone. The third eyewitness, Brown, was subjected to vigorous cross-examination. Haskins and Stone provided testimony strongly suggesting Brown was not engaged in a life-threatening struggle with Slider, and that Brown's first shot was taken after careful and deliberate aim at the young man. Stone further testified that as Slider lay on the ground, wounded from the first shot, Brown stood over him and continued shooting at him as Slider rolled around on the ground. Additionally, Stone stated that Slider made no verbal threat to Brown and only struck Brown once on the side of the face before Brown shot him. Additionally, jurors viewed a video of Brown sitting in his golf cart shortly after the shooting; the video was recorded by a camera mounted inside a police vehicle. As the officers converse with Brown, Brown is heard describing how, after the dog bit him and he shot the dog, both Stone and Slider "jumped on" him, how Slider then hit him, and how Slider then attempted to wrest the gun from Brown's control, at which point Brown exclaims, "I shot the Son of a B* * * *, before he could get the gun away from me."

As noted above, the physical evidence tended to contradict the testimony of Haskins and Stone with regard to the position of the two men when the shooting took

place. The autopsy and DNA results suggested that Slider and Brown were in very close proximity to each other at the time that Slider was shot through the neck and when Brown shot through his own hand. However, the State firmly established the absence of stippling around the abdominal area of Slider's skin or t-shirt—meaning there was at least twenty-four inches distance or more between Slider and the gun-barrel when Brown fired the fatal shot. Nevertheless, we may not declare the evidence factually insufficient when the parties' competing versions of the facts simply support equally reasonable theories of causation. *Goodman,* 66 S.W.3d at 287. Moreover, the jury's implicit rejection of the State's theory, that Brown intentionally or knowingly caused Slider's death, cannot be considered irrational given the following evidence: a physical confrontation took place between Slider and Brown; Brown was in fear for his life based upon Slider's verbal threats; Slider attempted to gain control of the handgun; Brown's rapid discharge of the handgun was done in such a desperate and uncalculating manner, that he was unaware he had shot through his own hand until the confrontation, as well as Brown's fear of imminent death ended. Having viewed all the evidence in a neutral light, we cannot say that the evidence supporting the manslaughter verdict is so weak, or that the evidence of Brown's recklessness is so against the great weight and preponderance of evidence of a greater culpable mental state as to render the manslaughter verdict clearly wrong and manifestly unjust. We therefore overrule issue three.

### LESSER-INCLUDED OFFENSES

██ Brown's first issue complains of the trial court's submission of the lesser-included offenses to the jury. Upon the State's request, and over Brown's objection, the trial court instructed the jury on the offenses of manslaughter and criminally negligent homicide, both being lesser-included offenses as a matter of law because of the type of murder alleged in the indictment. *See* TEX.CODE CRIM. PROC. ANN. art. 37.09(3) (Vernon 2006); *Wasylina,* 275 S.W.3d at 910; *Schroeder v. State,* 123 S.W.3d 398, 400–01 (Tex.Crim.App.2003); *Saunders v. State,* 913 S.W.2d 564, 572 (Tex.Crim.App.1995). The jury convicted on the lesser-included offense of manslaughter. As he does with his legal and factual sufficiency challenges, Brown insists that the record evidence indicates he intentionally shot Slider in self-defense, and that there is no evidence that he was either reckless or criminally negligent so as to support jury instructions on manslaughter or criminally negligent homicide.

██ In determining whether a lesser-included offense instruction is appropriate for submission to the jury, the reviewing court considers all of the evidence introduced at trial, whether by the State or by the defendant. *Goodwin v. State,* 799 S.W.2d 719, 740 (Tex.Crim.App.1990). "The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether . . . a lesser-included offense [instruction] should be given." *Banda v. State,* 890 S.W.2d 42, 60 (Tex. Crim.App.1994); *Hayes v. State,* 728 S.W.2d 804, 809 (Tex.Crim.App.1987). It is the jury's duty, when appropriately instructed, to determine whether the evidence is credible and supports the lesser-included offense. *Id.* It is also important to note that the State may request a lesser-included offense instruction be submitted to the jury, as may the defendant. *See Fransaw v. Lynaugh,* 810 F.2d 518, 529 (5th Cir.1987); *Hampton,* 165 S.W.3d at 694; *Arevalo v. State,* 943 S.W.2d 887, 890 (Tex.Crim.App.1997).

■ In reviewing the propriety of submitting a lesser-included offense, we use a two-prong test. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex.Crim.App.1993). First, the lesser-included offense must be included within the proof necessary to establish the offense charged; and second, there must be some evidence in the record that would permit a rational jury to find the defendant guilty of the lesser offense, but not guilty of the greater charged offense. *Id.* As noted above, because both manslaughter and criminally negligent homicide contain lesser culpable mental states than the murder alleged in the indictment, the first prong of the *Rousseau* test has been met. To meet the second prong, we must determine if there is some evidence from which the jury could rationally acquit Brown of murder while convicting him of manslaughter. *See Mathis v. State*, 67 S.W.3d 918, 925 (Tex.Crim.App. 2002) ("The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense."). Most importantly, it is not enough that the jury simply disbelieves crucial evidence pertaining to the greater charged offense, but there must be some evidence directly pertinent to a lesser-included offense for the jury to consider before a lesser-included instruction is warranted. *See Hampton v. State*, 109 S.W.3d 437, 441 (Tex.Crim. App.2003) (citing *Skinner v. State*, 956 S.W.2d 532, 543 (Tex.Crim.App.1997)).

As we discussed above in conjunction with quoted examples taken from the record, the jury could have reasonably rejected the State's theory that at the time he fired his handgun Brown's conscious objective or desire was to cause Slider's death. Brown testified to the following: he was attacked by the pit bull dog, then attacked by Ms. Stone, and then attacked and threatened with death by Slider; Slider fought to get control of Brown's handgun; Brown feared for his life; and Brown "didn't want to hurt the dog, or [Slider] or [Stone] or nobody." The testimony and physical evidence presented the jury with an incident of very short duration (20 to 30 seconds), mixed with a fair amount of confusion. As previously noted, criminal culpability may be inferred from the acts, words, and conduct of the accused. *Patrick*, 906 S.W.2d at 487. It is undisputed that at some point during the struggle Brown managed to fire the handgun while he was pointing it at Slider. The issue of the voluntariness of an actor's conduct is separate from the issue of the actor's mental state. *See Rogers v. State*, 105 S.W.3d 630, 638 (Tex.Crim.App.2003) (citing *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex.Crim.App.1993)). The record before us contains evidence directly pertinent to Brown's recklessness with his handgun so as to permit the trial court to provide the jury with an instruction on manslaughter. *See Thomas v. State*, 699 S.W.2d 845, 850 (Tex.Crim.App.1985) ("Evidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another, indicates a person who is aware of a risk created by that conduct and disregards the risk."). Thus, the record contains at least "some" evidence from which the jury could rationally acquit Brown of murder and convict him of manslaughter. It was not error for the trial court to submit an instruction on the lesser-included offense of manslaughter to the jury.[3] Issue one is overruled.

---

**3.** We agree with Brown that there was no record evidence that would have permitted the jury to convict only of criminally negligent homicide. *See Hampton,* 109 S.W.3d at 440–

41. Although it was error, therefore, to have submitted this issue to the jury, we can find no harm under *Almanza* as the jury rejected the issue, and Brown's brief is silent on this

## TRIAL COURT'S EVIDENTIARY RULING

■ Brown's fourth and final issue complains of trial court error in permitting the State to use Brown's grand jury testimony at trial in violation of a pretrial discovery order. The record indicates that approximately eight months before trial commenced, the trial court held a hearing on pretrial motions pursuant to article 28.01 of the Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 28.01 (Vernon 2006). On the same day as the hearing, June 27, 2007, Brown filed four motions: "Motion for Discovery of the Arrest And Conviction Records of State's Witnesses," "Motion for Discovery of Exculpatory and Mitigating Evidence," "Motion for Production of Evidence Favorable to the Accused," and "Motion for Discovery." Each motion listed a number of requested items purportedly in the possession of the State. In the motion for discovery, there were twelve items that Brown requested the trial court order the State to "produce and permit counsel for Defendant to inspect[.]" One of the items requested by Brown was "[a]ll testimony given by Defendant before the grand jury in connection with this offense."

The article 28.01 hearing was very brief and only touched on whether Brown's request for "mitigating" evidence was limited to exculpatory evidence or included something more. No mention was made of Brown's grand jury testimony. Near the end of the hearing, the trial court announced the following:

> THE COURT: That's fine. So, I'm presuming, [Trial Counsel], you will get what discovery that you need. And if there is a problem, then y'all will come back to the Court for any assistance, if there is a problem. Otherwise, I think we are in agreement as to what you are

going to get and what you are not going to get.

> [Trial Counsel:] Yes, sir.
>
> THE COURT: That's fine.

Each of Brown's four discovery motions was accompanied by an order granting same signed by the trial court, but with the following handwritten notation by the trial judge: "Ruling as per record made." The record does not indicate Brown objected to this apparent limitation on his otherwise successful discovery requests nor did he request clarification of the trial court's handwritten notation.

The evidentiary challenge arose at trial during the State's cross-examination of Brown. In describing the struggle over the handgun between himself and Slider on direct examination, Brown indicated to the jury that at one point Slider grabbed Brown's *wrist* in an attempt to gain control of the weapon. Perceiving this as a significant departure from what Brown had told the grand jury, the State proceeded to attempt to impeach him during cross-examination with a portion of his recorded grand jury testimony. The distinction apparently consisted of Brown's having told the grand jury that Slider had attempted to gain control of the handgun by grabbing the *gun* itself, and not Brown's *wrist* as he testified to at trial. The situation appears in the record in the following manner:

> [State:] Do you remember testifying? He didn't have ahold of the gun, did he?
>
> [Brown:] He had my wrist.
>
> [State:] He had ahold of your wrist?
>
> [Brown:] Yes.
>
> [State:] That's not what you told the Grand Jury, though, is it?
>
> [Brown:] I don't know what I told them. You recorded it.

point. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g).

**386**

[State:] Yes, sir, we sure did.

[Brown:] Yeah.

[State:] First of all, let's go back to the business about the gun. You testified in Grand Jury, didn't you, about the gun— I mean, about the dog—

[Trial Counsel]: Your Honor, may we approach the bench?

THE COURT: Yes, sir.

(Bench conference out of the hearing of the jury).

[Trial Counsel:] Your Honor, I asked for copies of any recordings they have of my client; and they didn't tell me they even had that. I didn't know they recorded the Grand Jury testimony.

[State:] Your Honor, may I have an opportunity to reply to that?

THE COURT: Yes, sir.

[State]: [Trial Counsel] has been the district attorney of this county for some time before he was no longer the DA. It is well-known by everyone that when a potential Defendant testifies before a Grand Jury, it must be either recorded or be taken by a shorthand reporter. That law is very clear. And while it's secret, upon a written order from the Court, that information can be divulged to Defense counsel.

But we are just talking about his testimony, Your Honor. He had free access through his lawyer. I mean, this is absolutely information to be used to impeach with.

[Trial Counsel:] I would like to be able to at least look at it, Your Honor.

THE COURT: That's fine. You can see it later.

[Trial Counsel:] Before he uses it?

THE COURT: Yes.

[State:] Before I can use it?

THE COURT: No.

[State:] Thank you, Your Honor.

(Bench conference concluded).

The State continued to question Brown with regard to inconsistencies between his grand jury testimony and his trial testimony.

 Rule 33.1 of the Texas Rules of Appellate Procedure controls matters of preservation of error and provides, in pertinent part:

(a) In General. As a prerequisite to presenting a complaint for appellate review, the record must show that:

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

(A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]

TEX.R.APP. P. 33.1. Rule 33.1 represents the concept of "party responsibility," in which the "complaining party bears the responsibility [for] clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale." *Pena v. State,* 285 S.W.3d 459, 463–64 (Tex.Crim.App.2009). "To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Id.* at 464 (quoting *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App.1992)). Such an objection gives the trial court and opposing counsel an opportunity to correct the error. *Id.* (citing *Reyna v. State,* 168 S.W.3d 173, 179 (Tex.Crim.App.2005)). Additionally, whether a party's complaint is preserved also depends on whether the

complaint on appeal coincides with the complaint made at trial. *Id.*

Brown cites *Oprean v. State,* 201 S.W.3d 724 (Tex.Crim.App.2006), under issue four. *Oprean* involved a felony DWI prosecution in which the judge signed a pretrial order requiring that at least ten days before trial the State provide Oprean's counsel "all videos containing Oprean's voice." *Id.* at 725. The State used no video evidence in the guilt/innocence phase,[4] and the jury returned with a guilty verdict. *Id.* The State affirmatively represented to defense counsel that it would only be introducing prior convictions at the punishment phase to be conducted the following day. *Id.* The next morning, and only minutes from the start of the punishment phase, defense counsel learned the State was going to offer video evidence of one of Oprean's prior DWI offenses. *Id.* For purposes of addressing the instant issue, we reproduce the opinion's depiction of the manner in which Oprean's trial counsel raised the issue with the trial court:

> Outside the presence of the jury, defense counsel objected to the admission of the video, pointing out to the judge that the prosecutor had violated the discovery order by failing to allow the defense ten days to inspect the video and relating the conversation he had with the prosecutor the previous evening. The prosecutor replied that "there was no [Article 37.07(g) ] charge in this Court's discovery order and no [37.07] request was ever made by defense counsel, which is required to be made to me to give him this evidence." The trial

judge overruled defense counsel's objection to the tape's admission.

> Defense counsel then asked the judge to grant a recess so that he could inspect the video and prepare his strategy, but the judge summarily denied his request. The tape was introduced before the jury[.]

*Id.* In the instant case, when the State began cross-examining Brown about his prior grand jury testimony, trial counsel objected as follows:

> [Trial Counsel:] Your Honor, I asked for copies of any recordings they have of my client; and they didn't tell me they even had that. I didn't know they recorded the Grand Jury testimony.

This complaint adequately informed the trial judge that counsel is complaining of a violation of the pretrial discovery order. The purpose of the rule is to inform the trial judge of what counsel wants, why he thinks he is entitled to it, and to do so clearly enough for the judge and opposing counsel to understand in order to correct the error, if any. *See Pena,* 285 S.W.3d at 464.

However, the record does not indicate where Brown received an adverse ruling from the complaint made to the trial court as also required for error preservation under Rule 33.1(a)(2). When Brown followed the above-quoted complaint with the request, "I would like to be able to at least look at it, Your Honor[,]" the trial court simply responded, "That's fine. You can see it later." Additionally, Brown neither questioned the admissibility of the grand jury testimony in question,[5] nor did he

---

4. This fact was noted in the court of appeals' remand opinion conducting the harm analysis ordered by the Court of Criminal Appeals. *See Oprean v. State,* 238 S.W.3d 412, 415–16 & n. 2 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd).

5. Although article 38.22, section 5 of the Code of Criminal Procedure permits the use of, *inter alia,* an accused's grand jury testimony to impeach his testimony at trial, the grand jury testimony must have been acquired voluntarily from the accused before it is admissible even under these circumstances. TEX.

request a recess or move for continuance in order to examine Brown's grand jury testimony to additionally prepare his defense. *See Lindley v. State,* 635 S.W.2d 541, 544 (Tex.Crim.App.1982) (noting where State fails to disclose evidence previously ordered disclosed by trial court, defendant's failure to request postponement or seek a continuance waives any error urged in an appeal on the basis of surprise).

With regard to the rules of discovery, we find nothing in the record indicating Brown ever requested the trial court to schedule a "time, place, and manner" for completion of the pretrial discovery process pursuant to article 39.14(a) of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(a) (Vernon Supp. 2008). A pretrial discovery order is not violated when it does not contain the time, place, and manner for discovery to be accomplished, and the record is silent as to any time, place, and manner directives. *See State v. LaRue,* 108 S.W.3d 431, 435 (Tex.App.-Beaumont 2003), *aff'd,* 152 S.W.3d 95 (Tex.Crim.App.2004).

Brown's final appellate issue is overruled. The judgment of the trial court is affirmed.

AFFIRMED.

**STEVE McKEITHEN, Chief Justice, dissenting.**

I respectfully dissent. The majority asserts that there is "evidence directly pertinent to Brown's recklessness with his handgun[.]" After an exhaustive search of the record, I can find no such evidence.

Brown consistently testified that he was fighting for his life, and that he had no choice but to fire his weapon. That is an intentional act. It is a knowing act. What it is not is a reckless act. The majority relies on the language found in *Thomas v. State,* 699 S.W.2d 845, 850 (Tex.Crim.App. 1985) to create a reckless act where none exists. In *Thomas,* the defendant knew of a substantial risk of harm, and consciously disregarded the risk, resulting in the discharge of a firearm. *Id.* at 849. There is no evidence in this record that Brown disregarded the risk inherent in pulling the trigger of his firearm while pointing it at the decedent. In fact, *all* the evidence indicates that Brown consciously (*i.e.* intentionally) shot the decedent. The only evidence of recklessness in this record is the reckless behavior exhibited by the decedent in attacking a man whom the decedent knew was holding a loaded firearm. The majority seems to be saying that, because there is some evidence that Brown did not intend to kill the decedent, that is the functional equivalent of recklessness. This cannot be the law.[1]

I can find no way for a rational jury to conclude that Brown acted recklessly; therefore, I would sustain Brown's challenge to the legal sufficiency, and reverse the conviction and render an acquittal.

---

CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005) *See Madden v. State,* 691 S.W.2d 688, 691 (Tex.Crim.App.1985).

**1.** One can just hear the testimony: "I didn't mean to kill him. I just wanted to scare him a little." Or perhaps, "Everybody knows I'm a terrible shot. I was shocked when the bullet actually hit him."