The STATE of Texas

v.

Joe Edward LARUE, Appellee.

No. PD–985–03.

Court of Criminal Appeals of Texas,
En banc.

Nov. 10, 2004.

Rehearing Denied Jan. 12, 2005.

Douglas M. Barlow, Beaumont, for Appellant.

Rodney D. Conerly, Assistant District Attorney, Beaumont, Matthew Paul, State's Attorney, Austin, for State.

WOMACK, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

In this case, we must determine whether the exclusion of evidence was an appropriate sanction for the State's violation of a discovery order. The specific issue before us is whether the court of appeals correctly held that the trial court erred in finding the State's conduct to be a "willful" violation of the order and in excluding the untimely disclosed evidence on that basis. Because we find that the State's conduct was not willful, we affirm the court of appeals' holding that the evidence should not have been excluded.

The underlying facts of this case are essentially undisputed. The appellee was indicted for capital murder on November 1, 2001. The following is a timeline of the relevant events:

March 30, 2000: State submits evidence to lab for DNA testing—oral swabs, oral slides, DNA and blood cards from victim, blood vial and bloodstain from the appellee.

April 28, 2000: State submits evidence to lab for DNA testing—victim's shirt and cigarette butt.

Sept. 12, 2000: State receives lab report with results of analyses of March 30 and April 28 submissions.

November 1, 2001: Appellee indicted for capital murder.

November 7, 2001: Defense counsel appointed.

December 5, 2001: State submits additional evidence to lab for DNA testing-fingernail samples, hair, and swabs from victim.

December 14, 2001: Defense files motion for discovery.

January 25, 2002: Court grants discovery motion without fixing a date for discovery to be accomplished.

April 17, 2002: State receives lab report with results of analysis of December 5 submissions.

July 15, 2002 Trial setting—case reset for November 4, 2002.

November 4, 2002: Trial setting—case reset for February 10, 2003.

January 3, 2003: State provides defense with DNA test results from September 12, 2000 lab report after several requests from defense counsel (11 months after discovery order).

January 12, 2003: State designates expert witnesses.

January 31, 2003: Meeting between prosecutors and defense counsel; State turns over bulk of discovery material, including witness list, autopsy report, statements by appellee, lab submission reports, and multiple-page summary prepared by State.

February 13, 2003: State provides defense with copy of lab report from April 17, 2002 (10 months after discovery order).

February 13, 2003: Jury selection begins.

March 3, 2003: Prior to commencement of general voir dire, State discloses that additional evidence (hair from fingernail scraping) is available for testing and asks whether defense wants tests performed.

March 5–7, 2003: Suppression hearing.

March 7, 2003: Defense files motion to suppress.

March 12, 2003: Trial court enters findings of fact and conclusions of law, grants motion to suppress, and orders case to proceed as scheduled.

After the discovery order was issued, defense counsel made repeated requests of the State for the DNA evidence. These requests were made either in person or by telephone until late 2002, at which time the parties began written communication. During pretrial proceedings on March 5, 2003, defense counsel informed the trial court of his intent to file a motion to suppress the State's DNA evidence due to the untimely disclosure of the evidence. The trial court took up the issue immediately and heard argument and testimony from the prosecutor and defense counsel regarding the discovery process. The court then entered findings that the State's disclosure of the evidence was untimely and that the State acted willfully in its failure to comply with the discovery order. Specifically, the court found that "the State's conduct in failing and refusing to provide the Court-ordered discovery in a fair and timely fashion exceeds negligent conduct, and was in fact a willful and egregious effort by the State to defeat defendant's constitutional rights." The court then concluded that because the State acted willfully, the DNA evidence should be excluded.

The court of appeals reversed. It first noted that "[e]vidence willfully withheld from disclosure under a discovery order

should be excluded from trial,"[1] and defined a willful act as one that is "done voluntarily and intentionally, with the specific intent to disobey the law."[2] The court found that "the record does not support a finding of intentional disobedience [by the State] of the trial court's discovery order" and "does not reflect a willful violation of [that] order."[3] Therefore, the court concluded, the trial court erred in excluding the evidence. We granted review.

First, we agree with both the trial court and the court of appeals on the issue of the timeliness of the State's disclosure of evidence after the discovery order was granted. The State should have produced the evidence in more timely fashion, especially considering the repeated requests made by defense counsel. Therefore, we are concerned only with the court of appeals' review of the trial court's choice of sanctions for the State's noncompliance.

The trial court's order excluding the evidence was based on its ultimate finding that the State acted willfully in violating the discovery order. We disagree with this finding. The facts pertaining to the State's conduct do not demonstrate a willful violation.

The trial court seemed particularly concerned with three situations it believed to be evidence of the willfulness of the State's conduct. First, the court found that on two separate occasions, the prosecutor, believing that he would no longer be in charge of the case, failed to respond properly to defense requests for discovery and instead worked on other matters. According to the trial court, this "election" not to turn over the evidence and to work on

other matters constituted a "willful choice" made by the State. While it is obvious that the prosecutor consciously chose this course of conduct, his actions were "willful" only with respect to the conduct itself. In other words, his choice to engage in conduct that, in effect, would violate the discovery order was voluntary. But we find no evidence in the record that, by his choice, he intended to violate the order or harm the defense. At the hearing, the prosecutor explained that he was told in late November 2002 of his assignment to another court and that he should transfer his files to his successor in the court where this case was pending. He then explained his failure to turn over the requested evidence to the defense:

> From the time I was told, "You're not in this court anymore," until that moment, I put this case out of my mind because it was no longer at that point my responsibility. It doesn't go to the responsibility of the district attorney's office, but I do think it goes towards the issue of intent or bad faith in the failure of providing discovery.

The prosecutor may have been extremely negligent or even reckless with respect to the result of his actions, but we do not believe that this conduct rises to the level of willfulness.

A second example of conduct to which the trial court's findings referred—one which the court said "weigh[ed] heavy on its finding" of the State's "willful and egregious effort ... to defeat defendant's constitutional rights"—involved the timing of a fax sent by the State to defense counsel. The record shows that "sometime between Christmas [of 2002] and New Year's," de-

1. *State v. LaRue,* 108 S.W.3d 431, 434 (Tex. App.-Beaumont 2003) (citing *Jackson v. State,* 17 S.W.3d 664 (Tex.Cr.App.2000); *Hollowell v. State,* 571 S.W.2d 179 (Tex.Cr.App.1978)).

2. *Ibid.* (quoting BLACK'S LAW DICTIONARY 1599 (6th ed.1990)).

3. *Id.,* at 437.

fense counsel spoke with the prosecutor about the need for discovery. The prosecutor "informed [defense counsel] that this was the first he knew that the file was still going to be his and he would provide [the defense] with discovery[.]" At that point, defense counsel told the prosecutor that he would be attending a continuing legal education (CLE) course during "the first week of January" and that he needed the evidence "pronto." The State faxed the discovery information to defense counsel on January 3, 2003, the day defense counsel left for his CLE course. The fact that defense counsel mentioned his future absence from his office to the prosecutor shows the State's awareness that he would not receive the fax immediately, and the fax did include a letter from the prosecutor apologizing for the "confusion." The record, however, gives no indication that the timing was anything more than negligence on the part of the State. We do not believe it reasonable to infer that the prosecutor's decision to fax the information at that particular time (less than a week after learning about the CLE course) was a strategic and purposeful effort to thwart the defense in its preparation of its case. The trial court's characterization of the event as "gamesmanship at the expense of defendant's constitutional rights to a fair trial" is not supported by the record.

A third example that the trial court cited as contributing to its finding of willfulness was the State's response to the court's ruling at the conclusion of the hearing on March 7. After both sides finished presenting their arguments, the court indicated that it was not going to exclude the evidence but was going to declare a mistrial:

COURT: [M]y prior feelings of the conduct not being intentional or willing on behalf of the State still stands. However, I do find that the conduct of the State was extremely negligent. I believe that the discovery in this case was not timely done. I think it was not handled properly. I'm not going to exclude the evidence. What I am going to do is I'm going to dismiss the jury in this case, which I do so with regret because we have spent over a month trying to get this process going. ... But we're going to do that out of an abundance of caution for [the defendant]. ... Now I'll entertain any thoughts or objections.

DEFENSE: Your Honor, of course, on behalf of the defendant, we do have to object. We've selected a jury in this cause. We're satisfied with that jury. We believe that is denies him due process and also his right to a speedy trial ...; and we would prefer to go ... forward on March 17 as scheduled.

\* \* \* \* \* \* \* \*

COURT: And I'll overrule [that objection]. And, for the purposes of the record, I want everybody to know I'm making this motion on my own because I've been placed in a position that I have to do that. ... And once again, it is indeed unfortunate that we have to release this panel and waste our time; but that's what I'm going to do. Any response from the State?

\* \* \* \* \* \* \* \*

STATE: Judge, we have no arguments at this point.

COURT: Are there any objections to the Court's ruling?

STATE: Well, Judge, if you ask me specifically—I would rather stand moot [sic]. But if the Court wants me—

COURT: No. I want them.

STATE: Yes, sir, Judge. We are ready for trial. We feel like the motion, as I've argued, to suppress is not adequate. And on top of all that, this defendant has not asked for a continuance. ... So, I assume if he hasn't

asked for a continuance that he's ready to go to trial. ... So, in order to protect the record, I guess, since you have asked me to speak on it, I do object because there's no continuance. ... He's said, "I want to go to trial." ... We're ready to go. ... And of course, whatever this learned Court decides, we respect that tremendously.

COURT: Okay. If that is the position of the State, then I'm going to grant— I'm going to agree with you. And what we're going to do is I'm going to adopt all prior findings in the record. The case will proceed to trial March the 17th. All DNA scientific analysis and testing will be excluded from that proceeding, and we'll move forward March 17th.

STATE: Can I have one other second, Judge?

* * * * * * *

Judge, of course, this is a little unusual. I've never been in this position before; so, I think the proper thing for us to do is to ask you to stay this case for at least a few days to have us the chance to go up on appeal [sic].

COURT: You've got between now and March 17th to do that.

* * * * * * *

And if we're going to take that approach to it, then the Court also wants additional time to review this file. I want to review the record, and my findings as to the conduct is subject to change as well.

STATE: Judge, I may be missing something here; but are you insinuating that you're going to punish the State of Texas because we've asked you to stay this case because we're going to appeal?

COURT: Oh, no, sir.

* * * * * * *

What I'm telling you is if you need more time, then I certainly would like to have more time, too. I'm trying to—

STATE: About what conduct, Your Honor, if I may inquire?

COURT: Well, the conduct of the State in discovery, yes, sir.

The trial court pointed to the State's comments to support its finding of willfulness: "The final comments of the State indicating its desire to exclude any lesser remedy demonstrates the willfulness of the conduct in withholding the evidence and complete disregard of the constitutional rights of the defendant in this case." We disagree. The State's objection to the trial court's ruling, which the court specifically asked to hear, was in no way relevant to the nature of the State's conduct when it violated discovery order. While avoiding additional delay may have been advantageous to the State, there is no evidence that the prosecutor's request to proceed was calculated specifically to deny the appellee his constitutional right to a speedy trial. This seems especially true given the fact that, only moments before, the defense also was urging that the trial proceed.

The record demonstrates that the State made what the prosecutor himself described as "grievous error[s] and mistake[s]," but there is no evidence that the prosecutor in this case acted with the specific purpose of disobeying the court's discovery order, preventing the defense from preparing its case, or denying the defendant his constitutional rights to a speedy trial or effective assistance of counsel.

The trial court erred by finding that the State acted willfully in its noncompliance with the discovery order and by excluding the DNA evidence. The court of appeals' holding on this issue is correct. The court

of appeals also concluded that "[u]nder the circumstances in this case, the appropriate solution to the discovery dispute was a continuance of the trial."[4] Because the trial court's ultimate findings characterized the State's conduct as willful, and as neither party presents argument regarding what remedies are available when the State's conduct is of a less culpable nature, we express no opinion as to what alternative sanction the trial court should have imposed.

The court of appeals' judgment is affirmed.

COCHRAN, J., filed a concurring opinion, in which MEYERS and HOLCOMB, JJ., joined.

JOHNSON, J., filed a dissenting opinion, in which PRICE, J., joined.

COCHRAN, J., concurring, in which MEYERS, and HOLCOMB, JJ., joined.

I join the Court's opinion. I wish to emphasize that, from my reading of the record, the trial court's ruling excluding the DNA test results was made solely for the purpose of sanctioning the prosecutor. There was no evidence submitted that, because of the prosecution's tardiness or sloppiness, the defense could not have its independent expert retest the material or prepare adequately to testify. Apparently, the trial court's ruling was intended to punish the prosecutor, not to protect the defendant. Had the defendant shown that he was unable to prepare a defense to this scientific evidence in the time remaining before trial, I would be less concerned about the "willfulness" of the prosecutor and more concerned about the due process rights of the defendant. But as it is, the citizens of Jefferson County should not be deprived of otherwise relevant, reliable evidence in a capital murder trial because of the prosecutor's negligence.

JOHNSON, J., dissenting in which PRICE, J., joined.

"Willful: 1. deliberate, voluntary, or intentional; 2. perversely obstinate; unreasonable stubborn or headstrong.... Synonyms: WILLFUL, HEADSTRONG, PERVERSE, WAYWARD refer to one who stubbornly insists upon doing as he pleases. Willful suggests a stubborn persistence in doing what one wishes, esp. in opposition to those whose wishes or commands ought to be respected or obeyed." (Emphasis in original.) Webster's Encyclopedic Unabridged Dictionary of the English Language, p. 1634, Gramercy Books, 1989. "[W]illful, as we have said, is a word of many meanings, its construction often being influenced by its context." *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943). "[S]tubbornly, obstinately, perversely, [citations omitted]. The word is also employed to characterize a thing done without ground for believing it is lawful [citations omitted], or conduct marked by careless disregard whether or not one has the right so to act [citations omitted]." *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381 (1933).

"In representing a client, a lawyer shall not: (1) neglect a legal matter entrusted to the lawyer; ... As used in this Rule, 'neglect' signifies inattention involving a conscious disregard for the responsibilities owed to a client or clients." Texas Disciplinary Rules of Professional Conduct, Rule 1.01(b)(2), (c) (2003). "A lawyer shall not: ... (d) knowingly disobey, ... an obligation under the standing rules of or a ruling by a tribunal...." *Id.*, Rule 30.4.

---

4. *Id.*, at 435.

## The Conduct

The question here is, at what point does "negligent" become "willful"? At what point does extended neglect interfere with the preparation of the defense or raise the constitutional issues of speedy trial and effective assistance of counsel? The crime occurred in 1989, and some DNA was tested. Appellee was indicted in 1991, but the indictment was dismissed in 1994 "in the interest of justice" because the state believed that "the case could not be successfully prosecuted with the evidence in hand at that time."

The prosecutor in this case submitted DNA samples in March and April 2000 and received the results in September 2000, yet didn't reveal the results to the defense until January 2003, even after having been ordered to do so by the trial court in January 2002. An additional state submission for DNA testing in December 2001 produced results in April 2002, yet, in spite of an existing court order, the prosecutor did not reveal the results to the defense until February 2003. Just before *voir dire* began, this same prosecutor revealed that there was additional DNA evidence that he had not yet submitted for testing.

It is undisputed that, during the time that DNA results were available and ordered to be given to the defense, from January 2002 until January 2003, defense counsel repeatedly asked the prosecutor for the DNA results. There was a hearing on the matter in August, to no avail. The District Attorney's office even held a press conference during which it bragged to the press that it had highly incriminating DNA evidence and a jailhouse confession to another inmate. In spite of all this, the prosecutor continued to withhold that long-available and publicly touted evidence from the defense counsel. It was only in the face of this extended intransigence by the prosecutor that defense counsel informed the trial court that he intended to ask that the withheld DNA results be suppressed.

The prosecutor at issue here had been assigned to the case from the beginning and had been a felony prosecutor in Jefferson County for seventeen-and-a-half years. The case was originally set for August 2002, but was reset "in part" because of the state's continuing failure to comply with the discovery order. The trial judge retired on December 31, 2002, and was replaced by an experienced criminal practitioner who had practiced in Jefferson County and was familiar with its procedures and practices. On January 18, 2003, the prosecutor told the defense about a hair that was found at the scene but had not yet, 14 years after the crime, been tested. With *voir dire* set to begin February 13, 2003, the bulk of the ordered discovery was turned over on January 31, 2003, when the state gave the defense its list of 73 potential witnesses,[1] the autopsy report, *Brady* material, and evidence-collection and laboratory-submission reports. On February 13, 2003, the day the case was called for trial, the prosecutor tendered, for the first time, DNA test results from April 17, 2002, for tests performed on fingernail and hair samples. The results from DNA tests from 1993 were apparently never tendered.[2]

1. The state tendered only names, without addresses or other contact information. The stated justification was that the addresses were from the time of the offense in 1989 and therefore were probably not correct. This raises the question of how the state expected to find and subpoena those witnesses if the out-dated addresses were all it had.

2. Those tests were performed with the technology available at the time and are now considered crude and less reliable than tests that are currently available. The results were

The trial court made several attempts to resolve the matter in a manner fair to both sides, but faced objection by the state for every option except continuing the trial and using the disputed evidence. He first suggested a continuance. Both sides objected, the defense because it required the defendant to choose between a fair trial and a speedy one,[3] and the state because it was ready. The court then offered to declare a mistrial, over defense objection, and reset the case to allow the defense to examine the DNA evidence and obtain expert witnesses if necessary. This would have allowed the state to use the disputed evidence, but at a later date. Both sides objected again, the defense because it had a jury that it was satisfied with, the state because the defendant had not requested a continuance and so should be tried as scheduled. At that point, the judge gave the state what it asked for, a trial as scheduled, but excluded the disputed scientific evidence.[4] The state then filed an interlocutory appeal.

The prosecutor's excuse for failing to turn over the DNA evidence until January 2003 is that he was told in November 2002 that he had been reassigned to another court and that he should give his files to his successor. This does nothing to explain his failure to promptly turn over the DNA results that he had received in September 2000 and April 2002, and he had had in his possession for twenty-six and six months, respectively. He provides no explanation for his failure to turn over the results from the March 2000 submission immediately after the court ordered disclo-

sure in January 2002 or his failure to immediately turn over the results from the December 2001 submission as soon as he received them in April 2002, after the discovery order was entered. He attempts to fault defense counsel, who made repeated requests for the ordered information, his argument seeming to be that defense counsel did not work hard enough to catch the prosecutor in his office and get the reports.

As the trial court noted, on two occasions the prosecutor, believing that he would, *in the future*, no longer be in charge of the case, willfully neglected his duty to that case *in the present*. Any attorney of record must remain on the case until he is relieved by the court or substitute counsel has taken over the case and must continue to represent the client zealously, even when he or she knows that another attorney will shortly be in charge. We can require no less of an attorney when the client is the state of Texas.

While the trial court initially found, on March 7, 2003, that the prosecutor's conduct was not willful, the prosecutor continued to assert, in five hearings over four-and-a-half days, that discovery was timely given and attempted to blame his failure to turn over the ordered evidence on the defense. The trial court then stated that its previous finding was "prematurely made" and that "the State's conduct in failing to provide the Court-ordered discovery in a fair and timely fashion exceeds negligent conduct, and was in fact a willful

tendered to the attorney who defended appellee on the original indictment, but there is nothing in the record to indicate that they were given to the current attorneys or that those attorneys had access the previous attorney's file.

3. At time of trial, appellee had been in jail for two-and-a-half years.

4. I note that, in the clerk's record, there is a state's proposed findings of fact and conclusions of law that requests precisely the action by the court that it is now appealing-suppression of the DNA evidence.

and egregious effort by the State to defeat the defendant's constitutional rights." The only conclusion that I can come to is the same one the trial court reached: the prosecutor neglected this case for so long and in such degree that his neglect became willful.

The trial judge chose not use the state's proposed one-page of findings and conclusion of negligence and instead filed thirteen pages of detailed findings of fact and conclusions of law. We have repeatedly held that we will defer to the judgment of the trial court on findings of fact. We should do so here. The only issue should be whether the remedy of exclusion was appropriate.

### The Remedy

The state appeals pursuant to Tex.Code. Crim. Proc. 44.01(a)(5). In *State v. Medrano*, 67 S.W.3d 892, 896 (Tex.Crim.App. 2002), we said that "the purpose of the statute is to permit the pretrial appeal of erroneous legal rulings which eviscerate the State's ability to prove its case." We therefore should consider whether the action of the trial court "eviscerated" the state's case.

The trial court found that the state asserted in a letter to counsel, dated January 3, 2003, with a copy sent to the trial court, that the state had "other evidence to substantiate the allegations in the indictment independent and separate from the complained of DNA analysis and other scientific evidence." The state tendered a witness list that included 28 law enforcement witnesses, 19 scientific and medical witnesses and 26 civilian witnesses, including Raymond Gross, an inmate who would testify that appellee had confessed the murder to him while in custody. Other evidence included autopsy reports, appellee's fingerprints on the inside of a window and, presumably, witnesses to sponsor them.

As the trial court stated, "this Court concludes by such documents tendered to this Court by the State that exclusion of the DNA analysis evidence does not necessarily result in the termination of the prosecution herein." Again, we should defer to the trial court in matters involving findings of fact and should not disturb its finding that suppressing the DNA evidence would not eviscerate the state's case. I would reverse the judgment of the court of appeals and affirm the actions of the trial court.

As a practical matter, this appeal has been pending for almost two years. If the state has now complied fully with the court's discovery order in a timely manner and the appellee has now had time to take whatever steps deemed appropriate in response to the proffered evidence, the trial court may wish to reconsider its suppression order. That is a decision best left to the trial court.

I respectfully dissent.