

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-13-00010-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | Criminal District Court Number One |
| JORGE SANCHEZ, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20100D04455) |
| | § | |

**O P I N I O N**

Jorge Sanchez is charged with the offense of possession of marijuana. Sanchez filed a pretrial motion for sanctions alleging the State had failed to comply with the trial court's discovery order. The trial court heard and granted Sanchez' motion for sanctions, suppressed all of the State's evidence, and entered findings of fact and conclusions of law. The State appeals the trial court's granting of Sanchez' motion for sanctions and its suppression of the State's evidence. We sustain the State's sole issue on appeal.

**BACKGROUND**

Sanchez filed motions for discovery on October 26, 2010, June 27, 2011, and on October 18, 2012. Each motion included either a general request for any evidence or information which

may be subject to disclosure under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or specified the type of evidence or information sought under the provisions of *Brady*. No order regarding the first discovery motion is contained within the record. Although the order being appealed relates solely to Sanchez' October 18, 2012, discovery motion, a recitation of the proceedings relating to his June 27, 2011, discovery motion provides the proper context necessary for our review of the State's issue.

*2011 Discovery Motion*

In his second discovery motion filed on June 27, 2011, Sanchez made six specific requests for information. Sanchez first asserted that an examination of the State's file contained police reports indicating that a blue Cobalt vehicle driven by Juan Dedios Barrera, with Sanchez as a passenger, arrived at a home improvement store parking lot. After Sanchez exited the Cobalt, Barrera drove away. Sanchez then entered and drove away in a truck that had been under police surveillance in the parking lot. The State's file contained a report reflecting that Barrera was later identified and interviewed by two police detectives. Pursuant to *Brady*, Sanchez sought an order directing the State "to furnish the defense with all information relating to the interview of [Barrera] to include whether prosecution was initiated against him or if not why not and any other memorandum statements or other evidence indicating the content of statements made by [Barrera]." *Brady v. Maryland*, 373 U.S. at 87.

Sanchez' second, third, and fourth requests related to canine searches of the truck. In his second *Brady* request, Sanchez noted that although the State's file contained evidence that a dog sniff search had been conducted on the truck before Sanchez took possession of it in the parking lot, he complained that no information was contained therein regarding a post-stop sniff search that

2

had allegedly been performed by a Border Patrol canine officer. *See Brady*, 373 U.S. at 87. Sanchez sought the State's tender of any evidence relating to an El Paso Police or Border Patrol dog sniff search of the truck after the truck Sanchez was driving was stopped. In his third *Brady* request, Sanchez asked the trial court to order the State to produce all training records of "the dog used in the initial search by the Border Patrol agent and any records relating to the training and expertise of the agent himself in conducting such searches." Sanchez' fourth request sought the revelation of any reports or evidence concerning a purported third canine search of the truck conducted on the following day in an impoundment lot, during which the canine allegedly did not alert during the search of the truck.

In his fifth request, Sanchez asserted that he made certain unidentified statements to El Paso police officers during his traffic stop, and requested that the State "produce in written form the substance of any statements made by the defendant to any of the officers subsequent to the traffic stop which are exculpatory in nature" because the State's file did not contain any recitation of those statements made.

Sanchez' final request complained that the State's file included his "rap" sheet showing arrests for various offenses, noted that the report was incomprehensible, and asked that the trial court direct the State "to produce any evidence, court records, witness statements, or other relevant matters relating to any prior arrests of this defendant."

*Hearings on the June 2011 Discovery Motion*

Sanchez' June 27, 2011, discovery motion was heard on three occasions by two different judges. The State was represented by a different Assistant District Attorney on each of those occasions.

Hon. Peter S. Peca presided over the first hearing conducted on July 1, 2011. In response to Sanchez' motion, the State declared that it would disclose anything that would indicate exculpatory evidence arising from the police officers' interview with Barrera or in discussing matters with someone else. The State noted that it did not have to turn over canine or canine-handler records but acknowledged that they must prove that they were each certified and trained on the day the dog sniffs occurred. The State agreed that it would disclose any reports that may exist regarding the dog search at the impound lot. The State noted that it had pre-trialed two officers who indicated that Sanchez had not wanted to speak with them, and explained that although it was not aware of any exculpatory statements Sanchez may have made, it would disclose such information if discovered. The State acknowledged that there was an apparent discrepancy in Sanchez' rap sheet and said it would attempt to resolve the discrepancy by bringing it to the attention of the jail. When Sanchez' counsel, Mr. Michael Gibson, stated that he wanted to know what Barrera, the driver of the Cobalt, had told Sanchez, the trial court sustained the State's objection and stated, "I'm not going to give it to you. Get your own investigator and go out there and talk to him yourself and find out what he's got." The trial court noted that "if he said anything exculpatory, they're going to give it to you." No written order ruling on the motion is present in the record.

On November 18, 2011, Hon. Susan Larsen presided over the second hearing on Sanchez' June 27, 2011, discovery motion. After the State recited by cause number a possession of marijuana case in which Sanchez had entered a plea and served five days in jail, Gibson stated that he wanted the State to reveal Sanchez' criminal record because Sanchez had informed Gibson that he had never been charged with any other drug offense. The State noted that it had an open file

4

policy, had the burden of proving the conviction at trial, and that the conviction would be admissible at punishment. Gibson complained that the State's file did not reflect that Sanchez was pulled over for a traffic violation, did not contain a police report regarding their interview with Barrera, the basis for the stakeout at the home improvement store, or any reference to a dog search of the truck after the stop and, according to Sanchez, while at the impound lot. Gibson informed the trial court that he wanted to know more about the police interview with Barrera, discover exculpatory facts, including whether Barrera was working for the police or "something of that nature." The trial court noted that "discovery is for things that are already in existence" and directed the State to provide information in its possession regarding the dog searches.

Before witnesses were called to testify, the State asked the Court to restrict questioning to the interview of Barrera. After Gibson objected that potential confidential informant issues would fall within the confines of *Brady*, the trial court observed that if Barrera was a confidential informant, Sanchez may be entitled to know that but reminded Gibson that "that's another issue . . . with different proof." Gibson disagreed with the Court, which noted, "[H]ow does . . . him being a confidential informant impact on the innocence of your client? . . . [W]e'll do that another day."

Under direct examination by Gibson, El Paso Police Detective Jose Lucero, the case agent, testified that he and his partner pursued the driver of the Cobalt and approached him in a store for the purpose of identifying him. Detective Lucero acknowledged that it was possible that the driver was involved in the "dope deal," and after determining Barrera's identity, the officers obtained Barrera's address and asked him to contact them. He explained that they did not interview Barrera further at that time, and did not make a report about the encounter. The officers

did not arrest Barrera because he was not caught driving the vehicle containing contraband, and the officers did not have probable cause to arrest him. When the officers attempted to locate Barrera approximately one week later, they were unable to locate him and discovered that the address that they had obtained for Barrera was not valid.

Gibson also questioned El Paso Police Detective Kenneth Jones at the discovery hearing. Detective Jones, too, testified that he and Detective Lucero encountered Barrera in the store, obtained information from him, and left without asking Barrera about marijuana. Detective Jones did not recall if Barrera was mentioned in any police reports but noted that there was no proof that Barrera had been involved in the marijuana case because he had been in a separate vehicle than Sanchez. The officers' subsequent attempts to locate Barrera were unsuccessful as Barrera had given the officers a bad address. On cross-examination, Detective Jones acknowledged that he and Detective Lucero were the only officers who spoke with Barrera.

United States Border Patrol Agent Jesus Arredondo testified that his canine, Xenia, alerted during an exterior canine sniff of the truck at the home improvement store. Xenia was certified by the United States Department of Homeland Security to detect several controlled substances, including marijuana. After officers made a traffic stop of the truck Sanchez was driving, Agent Arredondo conducted a another search during which Xenia made a second positive alert. Agent Arredondo testified that he did not conduct a third search of the truck in the following days and informed the trial court that he had furnished the State with the formal report regarding his involvement in the investigation. The State informed the trial court that is was uncertain that it had a copy of Agent Arredondo's report but stated that it would obtain one and make it available to Gibson.

6

At the conclusion of the hearing, the trial court asked Gibson if he wanted a written order, and Gibson replied that he did not. Gibson informed the trial court that he "may be coming back with some kind of a thing on confidential informants." The State observed that it had complied with the trial court's requirement that Sanchez be provided with information about the name of the canine officer at the time of the traffic stop, and Gibson agreed that requirement had been met. The trial court noted that its discovery order included Agent Arredondo's report if it was in the State's possession, and recessed the hearing.

On March 28, 2012, Judge Larsen presided over the third hearing on Sanchez' June 27, 2011, discovery motion. Gibson noted that Judge Peca had heard the motion during the preceding summer and alleged that, "Much of the stuff in the motion . . . was not really responded to ever by the State." When the trial court asked if the hearing was for the purpose of revealing the identity of a confidential informant, Gibson responded, "We know who that is," and stated that he wanted to know "some background on what these cops were doing and the information they had when they were . . . staking out this thing." Gibson stated that Sanchez would testify that he was offered money to repossess a car and explained that Sanchez had conducted his own search and had discovered that someone with the same name as Barrera had been arrested and charged with a drug offense, which was later dismissed. Gibson stated that he wanted the State to "make full disclosure" of anything relating to Barrera. Gibson acknowledged that he already knew the identity of the driver, Barrera, who had taken Sanchez to the truck, and explained that he was seeking Sanchez' rap sheets, the source of information to initiate the investigation, and all information that the State had referencing any prosecution against Barrera or his involvement as a cooperating individual setting up cases for the prosecution, as well as "what ever happened to

7

him." The trial court observed, "[J]ust by saying it's *Brady*, that doesn't mean it's exculpatory." Gibson suggested that an exculpatory entrapment defense was a "salient possibility" for Sanchez. Gibson then requested that the State provide information about a "second" dog sniff at the "impound lot," during which the dog purportedly failed to alert. Regarding the failure of the dog to alert at the impound lot, the State noted that the search had occurred several days later and "[t]hat's probably because the marijuana had already been removed from the truck." The trial court noted that the State was only required to prove that the dog and handler were certified. Gibson stated that he was also seeking any statements made by the defendant, who asserted that he had allowed police officers to search the truck.

In reference to the alleged confidential informant status of Barrera, the State responded that under Article 39.14 of the Code of Criminal Procedure, Sanchez was not entitled to the police reports "on anything like this," observed that Gibson had reviewed and was aware of everything in the State's file, and contended, "I'm not sure where I see that *Brady* even comes into this anywhere, because [Gibson is] aware of all of these things[.]"[1] The State further argued, "[T]here's no evidence that [Barrera] was involved in anything other than delivering [Sanchez] there[,]" and noted that the police had no probable cause to arrest Barrera because they had no information that connected him to the marijuana case. The State explained that the information regarding the dog sniffs conducted by Agent Arredondo were in the reports. While noting that Sanchez could obtain his own rap sheet, the State argued that it could not release NCIC rap sheets

---

[1] Article 39.14 was amended effective January 1, 2014, and now provides, in part, "Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." TEX. CODE CRIM. PROC. ANN. art. 39.14(h) (West Supp. 2013).

8

and again stated that Gibson had seen all the information in the State's file. The State also argued that Sanchez' pursuit of an entrapment defense was "all theory . . . there's nothing to indicate that any of that information is real or even exists" or that such information is exculpatory if it does exist. The State informed the trial court that it had no statements from Sanchez and that Sanchez' grant of permission to search the truck was not exculpatory. After the State observed that "[w]e had a complete hearing where these exact same issues were heard before the Court," the trial court stated that it would review the record before making its rulings.

On April 24, 2012, Judge Larsen issued a written order on Sanchez' discovery motion. In its order, the trial court observed that the State had indicated during the July 2011 hearing that it would provide any exculpatory evidence contained in any interview with Barrera and that Judge Peca had ruled during that hearing that Sanchez was not entitled to any other information from a third-party interview with the State, and expressly "confirmed" Judge Peca's ruling. The order directed the State to disclose any evidence in its possession regarding any dog sniff by any agency, and the training records of relevant dogs and handlers involved in searches, if not already disclosed, as well as any other evidence concerning a purported third search at an impound lot if such evidence exists. The trial court also directed the State to disclose any statements made by Sanchez, whether exculpatory or otherwise, which are in the possession of the State, and to disclose to Sanchez all information it possessed regarding Sanchez' prior record of arrests, convictions, deferred adjudications, or other dispositions.

*October 2012 Motions for Discovery and Sanctions*

On October 18, 2012, Sanchez filed his third discovery motion as well as a motion for sanctions. In his discovery motion, Sanchez asserted that, in the event Barrera was working as a

9

confidential informant for the State, such information should be disclosed to him. Sanchez alleged the State had failed to comply with his requests for such information despite his repeated requests at prior hearings. Based on facts discovered by his counsel which were purportedly related to an October 9, 2012, hearing, Sanchez stated that he "suspects that Mr. Barrera was 'working off a beef' and misled [him] into taking possession of the truck in which the contraband was discovered[.]"[2] Sanchez sought an order directing the State to disclose the information provided to the officers who were staking out the scene where Sanchez took possession of the truck, and specifically sought to determine whether such information was provided by Barrera or someone who may have been controlling him, as well as the information which justified the stakeout. Sanchez appended to his motion a copy of a document titled "Record Of Criminal Actions" regarding Barrera, and noted that Barrera had been indicted for possession of marijuana on December 14, 2010, and on September 29, 2011, the case was dismissed due to prosecutorial discretion.

In his motion for sanctions against the State, Sanchez referred to the trial court's April 24, 2012, order requiring that the State disclose "evidence made by" Barrera, and alleged the State had "failed and refused either to reveal <u>Brady</u> material or to comply with the orders of [the trial court] contained in that order[.]" Sanchez asked that the trial court hold the State's prosecutors in contempt, alternatively moved to bar the State from introducing during trial any evidence relating to the alleged involvement of Sanchez or Barrera in the commission of the offense, and asked the trial court to impose any other appropriate sanctions.

On November 19, 2012, Judge Peca heard Sanchez' October discovery motion. The State responded that it was not sure what Sanchez was seeking, and expressed its belief that no *Brady*

---

2 The record on appeal does not include a record of any hearing occurring on October 9, 2012.

material existed that had not been disclosed, and again noted that it had an open file policy. The State explained that it did not know anything, asserted that Sanchez was wanting to know about an individual and contended that the individual had nothing to do with Sanchez' case, and expressed confusion about why the hearing was being conducted. Gibson reiterated his belief that it was "obvious" that Barrera was involved, noting that the State had dismissed Barrera's drug case, and then alleged that Barrera was "doing something for the State." Gibson explained that he wanted to find out why police officers were at the home improvement store as well as the source of their information. Gibson suggested that if the story he had related was true, "it's extremely possible that Barrera was working off a beef or that he set up somebody . . . [a]nd was feeding him in order to help himself[, which] he rather obviously did[.]" Gibson next alleged, "the district attorney has never revealed anything," and argued, "There's obviously a long-term relationship with the DA's office[.]" One of the State's two prosecutors present at the hearing responded that the State had a case with Barrera in October 2010, the month after Sanchez was arrested, and had dismissed that case, objected to Sanchez' requests, and argued that if Barrera was under contract, "it would have nothing to do with this particular case[,]" and would be irrelevant. The trial court overruled the State's objection, directed that the State provide Sanchez with "every bit of information you have on this Mr. Barrera," and specified that "if he's ever been under contract to the State[,] you need to inform the defense in this case about that." The trial court directed that the State provide such information to Sanchez by November 30, 2012, and noted that it would hear Sanchez' motion for sanctions on December 19, 2012.

Judge Peca presided over the sanctions hearing. There, Gibson again alleged "the State has failed to comply. . . they've done . . . nothing." When Gibson again noted that he wanted to

11

know everything about the case that might relate to his defensive theory that Sanchez had been set up, the trial court asked, "[W]hy aren't you having a hearing and calling those officers and asking them those questions?" When Gibson responded that a hearing had been conducted, Judge Peca correctly observed that he did not believe he had presided over that hearing. Gibson then asserted that his client, Sanchez, believed Barrera was in a federal prison at the time of the sanctions hearing.

The trial court then stated:

So he could have been working off something for the feds rather that the DAs here, right? They do that all the time because there was a big article in the front page of the *USA Today* last Friday. Front page article on how all these snitches are working for the feds working off their stuff, setting up people. So maybe it's a fed deal. The feds do that all the time apparently according to *USA Today*. . . . [W]as [Barrera] . . . being sentenced in a federal court at the same time[?] That's what you need to find out. . . . I mean now that we think he might be in a federal court[,] that's a possibility, right? He could have had federal charges and state charges and he's working for the feds. And the feds work out a deal and then they get everything – but the State would have to know about that to dismiss it here, wouldn't they? You would think they would have to know about that. . . . [H]e might have gotten a reduced sentence. . . . I don't know how it works. But I'll tell you that in this court we have probably over 200 people working. Okay. It's getting to be an obscene portion of the docket in this court the number of people that are working for the State. Okay. And so we've got to get it under control. What kind of relief do you want from the State?

Gibson explained that when the State willfully withholds evidence that is subject to disclosure under a discovery order, that evidence is inadmissible, and he asked the trial court to rule that the State cannot be permitted in Sanchez' trial to introduce any of its evidence because the State had repeatedly refused to disclose exculpatory matters to the defense.

The State responded that it understood that it was to disclose at the sanctions hearing whether Barrera had ever worked as a confidential informant. The State explained that it had contacted the police department, the sheriff's office, and "the feds," and had been informed that

Barrera had never worked as a confidential informant for the police or the sheriff, and stated that the federal law enforcement personnel "have no record of [Barrera] working as a [confidential informant] either." The State argued that it had complied with the trial court's discovery order, and contended that Barrera's arrest in October 2010 for possession of marijuana was for a different incident that occurred after Sanchez' arrest in September 2010. Although confirming with the State that Barrera's arrest occurred in October 2010, and "[n]ot a date preceding" the trial court observed that it appeared Barrera was "in the marijuana business[.]" The State reiterated that Barrera was not arrested on the same day that Sanchez was arrested because the officers had no reason to arrest him as there was no evidence that Barrera "was working," and emphasized that "as far as I know[,] everyone I talked to said that [Barrera] did not give any information."

When the trial court observed, "They don't have anything. They have no response to you[,]" Gibson responded, "Judge, that's what she says[,]" and argued that Sanchez would testify to "a very, very distinct and strong possibility that he was set up by one of their snitches . . . obviously, Mr. Barrera got something for some reason." Gibson contended the State had "very carefully not addressed that issue" and asked why the State had dismissed a thirty-pound marijuana case.

The trial court then asked the State why it had dismissed Barrera's marijuana case, and the State asked if the discussion could be continued in chambers as the courtroom was full. The trial court then commented, "Like I say, in my opinion, we're researching the point of being obscene numbers of these people before the Court. Or we can't even manage our docket anymore[,] there's so many of them." As requested, the trial court continued the sanctions hearing in its jury room. There, the State informed the trial court that the State had dismissed Barrera's case

13

because, in that case, a motion had been filed to disclose a confidential informant who was working with the federal government and had "given up" Barrera. The State explained that the confidential informant in Barrera's case was unknown to the State and was not Barrera. The State explained that it had dismissed the case against Barrera so that it would not have to divulge the federal confidential informant. When the trial court countered that the federal confidential informant could have been a confidential informant in Sanchez' case, the State again explained that it did not know the identity of the confidential informant because "[the feds] didn't tell us when we discussed it with them, they just didn't want to give up their guy." The State explained that was all it knew about confidential informants.

The trial court then stated:

All right. All I'm saying is that the Court's concerned about several things. And one is that Mr. Gibson is making this argument right now and he's been making it for some time in this case, now we're reading in the newspapers that it's being not only talked about in other places with the feds in other parts of the country but it's actually apparently true.

And the complaints are – there's two versions of complaints. And this is the kind of complaints [sic] of using these confidential informants. And one of the complaints is that the government is using people who are committing crimes to entrap other people or to find other people and giving them reduced sentences.

And so that is – in the manner that we're talking about right here and getting people set up to try and get themselves off. And the other way they're using these people that they think it's not quite right is that the people that are working and able to reduce their sentences or their sentences of their friends are the people that really know what's going on. And so they're getting the good deals while the poor . . . shmucks that get picked up and don't know anything are getting the full treatment by the system. And so what we're doing is we're overly punishing people that really don't know what's going on but we're letting the people that really are in the business kind of run loose.

And what concerns this Court and, you know, I want it on the record and I'm putting it on the record there's an obscene number – percentage of the people on the docket of this court that are supposedly under written contracts with the State. And it just seems to me to be beyond the pail or whatever you call it. It's just gotten to the point where it's just ridiculous and these people are out there generating new cases for the State. The State ought to be able to generate their

14

own cases without the help of everybody that's in this court. A huge number. I mean, I could see a few people might be something that might be okay, but when you start getting close to half of the people in this court that are working. And I don't know if it is that because we don't really know. But it just seems from the information we get that we've gotten at least over 200 people working in this court. And I just want that on the record.

. . .

[T]hey need to give you the name of the feds and the snitch from the feds case, whoever was running that snitch, to find out if . . . that snitch has provided any information here. Because apparently it's the feds that's working with this person. So I don't know that . . . we can actually force the feds to cough that information up. And so – unless they're willing to come over here and say there was nothing going on.

Gibson informed the trial court that he was now going to have to have a hearing and "get all the stakeout cops back in here and start saying, you know, somebody tell me what you guys were doing there . . . [a]nd we're back to square one after all these months[.]" The trial court then suggested:

It could have been the same snitch that actually set Barrera up was trying to set him up this time, but unfortunately your client was the one that got in there. And your snitch didn't know that. He thought your client was going to stay there and [Barrera] was going to get in the truck. You see. And so they got the wrong guy the first time. So they came back the next month and got the right guy.

Gibson agreed that this scenario was a possibility, conceded that he did not know if it was a probability, and reminded the trial court that a motion for sanctions was before it. The trial court responded that it was granting Sanchez' motion for sanctions and would direct that the State is barred from presenting any evidence against Sanchez. The trial court further anticipated that his ruling would be appealed and observed:

And I'm telling you that it's a national issue. I'm thinking it's a national issue. . . . We've had the war on drugs that's going on for 30, 40, 50 years. People have gotten out of high school, gotten in the police force, spent their whole career on the war on drugs, retired, and still you can buy drugs anywhere you want, anywhere in this country. And they're available anywhere and nothing has been resolved in this matter. . . . And they're putting people in prison all the time. And drugs are

15

not good for anybody . . . but I'm just saying there's an awful lot of people working. There's too many people working to make me feel comfortable. . . . You may prepare a written order that I'm denying them the right to present any evidence against your client. . . . I'm going to look forward to reading the advance sheets in a couple of years. Maybe it'll make it all the way to the Court of Criminal Appeals. Maybe all the way to the United States Supreme Court. I'm not sure you have the best record, Mr. Gibson, but we have the best we can get because the State won't give us anymore, right? That's the whole problem. . . . I do think that, you know, if . . . Barrera was picked up a month later as a result of a snitch, it's not impossible to think that the snitch wasn't involved in the previous months deal too and they just picked up your client because he was the one that got in the truck. . . . And so what I'm saying is that Barrera was the snitch but there could be a snitch involved in both of these cases. It could be the same darn snitch . . . but Barrera outsmarted them when your guy got picked up. . . . [Y]ou can always prepare proposed findings of fact and conclusions of law if you want.

In its findings of fact, the trial court found that: (1) the State had failed to comply with its discovery order of November 19, 2012; (2) the State failed to comply with the discovery order by November 30, 2012; (3) the requested discovery material would be relevant in a trial of the case and, if defendant's allegations are confirmed, would probably result in a finding of not guilty by a rational jury; (4) the State did not make any attempt to comply with the Court's order and that the State's oral advice to the trial court that it had spoken to unnamed parties was factually insufficient to constitute a response to the trial court's order; and (5) the State failed to present facts or evidence to the Court which would convince the trial court that there is no substance to those matters described on the record by defense counsel as to the reasons for the discovery request.

The trial court concluded as a matter of law: (1) that the information requested in defendant's motion for discovery and stated on the record on November 19, 2012, clearly constitutes material required to be disclosed to defense counsel under *Brady v. Maryland*; (2) the State's refusal to comply with the trial court's November 30, 2012, deadline is a conscious refusal to obey a lawful order of the trial court and constitutes as a matter of law the basis for the trial

16

court's imposition of sanctions; and (3) the appropriate sanction is the trial court's order to prohibit the presentation or introduction of evidence in a trial of the case. In its order imposing sanctions, the trial court declined to find the State's prosecutors in contempt but suppressed the State's introduction of any evidence relating to the allegations in Sanchez' indictment.

## DISCUSSION

In its sole issue, the State alleges that the trial court erred and abused its discretion when it granted Sanchez' motion for sanctions and ordered as a sanction the suppression of all of the State's evidence. We agree.

*Standard of Review*

We review an order suppressing evidence for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex.Crim.App. 2006). When reviewing a trial court's ruling on a motion to suppress evidence, we utilize a birfurcated standard. *Guzman v. State,* 955 S.W.2d 85, 87-91 (Tex.Crim.App. 1997). As the sole fact finder at a suppression hearing, the trial court may choose to believe or disbelieve any or all of a witness's testimony. *Alvarado v. State,* 853 S.W.2d 17, 23 (Tex.Crim.App. 1993). When it is supported by the record, we give almost total deference to the trial court's determination of historical facts, particularly if the findings turn on witness credibility and demeanor. *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App. 2000); *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App. 2000). We afford the same deference to determinations of mixed questions of fact and law when their resolution depends upon witness credibility and demeanor. *Amador v. State,* 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Ross,* 32 S.W.3d at 856. However, when mixed questions of fact and law do not turn on an evaluation of credibility and demeanor, we consider them under a *de novo* standard. *Amador,* 221 S.W.3d at 673; *Ross,* 32

17

S.W.3d at 856. If it is reasonably sustained by the record and is correct on any theory of law applicable to the case, we will sustain a trial court's ruling. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). As the issue before us turns not upon a determination of witness credibility but, rather, upon the application of the law to the historical facts, we conduct our review *de novo. Amador,* 221 S.W.3d at 673.

*Analysis*

A criminal defendant's right to discovery under the United States Constitution is restricted to exculpatory or mitigating evidence in the State's possession, custody, or control. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(h) (the State is required to disclose to defendant any exculpatory, impeachment, or mitigating document, item, or information in its possession, custody, or control that tends to negate defendant's guilt or would tend to reduce defendant's punishment for the charged offense); *In re State*, 162 S.W.3d 672, 676 (Tex.App.–El Paso 2005, no pet.), *citing Dickens v. Court of Appeals for the Second Supreme Judicial District,* 727 S.W.2d 542, 551 (Tex.Crim.App. 1987). A criminal defendant has no general right of discovery beyond this. *See Washington v. State,* 856 S.W.2d 184, 187 (Tex.Crim.App. 1993); *In re State*, 162 S.W.3d at 676. When evidence is willfully withheld from disclosure required by a discovery order, that evidence should be excluded. *See Oprean v. State*, 201 S.W.3d 724, 726 (Tex.Crim.App. 2006); *State v. LaRue*, 152 S.W.3d 95, 97 (Tex.Crim.App. 2004).

In its conclusions of law, the trial court identified as the basis for its imposition of sanctions the State's refusal or failure to respond to its discovery order by the deadline of November 30, 2012. We disagree with the trial court's characterization of the State's failure to satisfy its discovery deadline as a conscious refusal. At the sanctions hearing, the State presented

18

information that Barrera was not known to be under any contract as a confidential informant. However, there is no dispute that the State failed to timely comply with the trial court's directive that the State furnish "every bit of information you have on this Mr. Barrera" by November 30, 2012. We therefore consider whether the trial court's imposition of the harsh sanction of excluding all the State's evidence is supported by a showing that the State willfully withheld evidence from disclosure. *See Oprean*, 201 S.W.3d at 726; *LaRue*, 152 S.W.3d at 97.

In determining whether the State acted willfully, a court is to consider two factors: (1) whether the State acted in bad faith in failing to disclose the evidence; and (2) whether the defendant can reasonably anticipate the contested evidence. *Henricks v. State*, 293 S.W.3d 267, 275 (Tex.App.–Eastland 2009, pet. ref'd), *citing Wood v. State*, 18 S.W.3d 642, 649-50 (Tex.Crim.App. 2000). In addressing the bad-faith prong of this analysis, a court considers whether: (1) the defendant established an intent by the State to deceive him; (2) the State's notice left the defendant adequate time to prepare; and (3) the State freely provided the defendant with information by maintaining an open file policy, providing updated witness lists, or promptly notifying the defendant of new witnesses. *Henricks*, 293 S.W.3d at 275. Intent is inferred from acts done and words spoken. *Oprean*, 201 S.W.3d at 728. In determining the anticipation prong of the analysis, a court considers: (1) the degree of surprise to the defendant; (2) the degree of disadvantage inherent in that surprise; and (3) the degree to which the trial court was able to remedy that surprise. *Henricks*, 293 S.W.3d at 275. A relevant factor that should be considered when determining willfulness is the validity of the explanation offered by the prosecutor. *Oprean*, 201 S.W.3d at 728.

19

We initially observe that throughout the various discovery hearings, the State was represented by five different prosecutors. The State had informed the trial court that it had an open file policy, believed that no *Brady* material had been withheld, did not know what Sanchez was seeking, explained that the individual about whom Sanchez wanted information had nothing to do with Sanchez' case, and the State had no information regarding Barrera acting as a confidential informant, and the State had agreed that it would disclose anything exculpatory arising from the police officers' interview with Barrera or from someone else. Indeed, while presiding at the initial discovery hearing, and in response to Gibson's statement that he wanted to know what Barrera had stated to Sanchez, Judge Peca directed Gibson to get his own investigator, speak with Barrera, and "find out what he's got." The State repeatedly stated throughout the proceedings that it has an open file policy and observed that Gibson knew what was in the State's file in Sanchez' case. At the third hearing, the State again observed that there was no evidence that Barrera was involved in any way in the Sanchez' case except for driving Sanchez to the truck, and that it had no statements or evidence to indicate otherwise, or that any statements or evidence was exculpatory.

The State revealed that Barrera's arrest was subsequent to Sanchez' arrest and noted that if Barrera had been a confidential informant, it would have no bearing on Sanchez' case. The State explained that it had understood that it was to make its disclosures ordered in response to Sanchez' third motion at the sanctions hearing. The State contacted the local and federal law enforcement personnel and reported that it had learned that Barrera was not a confidential informant. The State then disclosed to Sanchez and the trial court that rather than being a confidential informant, Barrera had been "given up" by a federal confidential informant. The State divulged to the trial

court and Sanchez all it knew and explained that it had dismissed its case against Barrera because federal law enforcement did not want to give up their confidential informant.

The record on appeal demonstrates that Sanchez did not establish that the State intended to deceive him, and there is nothing in the record showing the State provided information to Sanchez that would leave him inadequate time to prepare for trial. *See Henricks*, 293 S.W.3d at 275. Indeed, there is no evidence in the record that a trial date had been set or that trial was pending. There is no dispute that the State maintains an open file policy and no indication exists that the State failed to provide an updated list of witnesses to Sanchez or failed to promptly notify Sanchez of new witnesses. *See id.* The degree of surprise to Sanchez is non-existent. The State repeatedly informed Sanchez and the trial court that it had no information that Barrera was a confidential informant as Sanchez had suspected. There is no degree of disadvantage to consider and no surprise that the trial court was required to remedy because there is no evidence that Barrera was a confidential informant in Sanchez' case. *See id.* Moreover, Gibson knew that Barrera had not been interviewed when police encountered him for the purpose of identifying him, and informed the trial court that he believed Barrera was in a federal prison at the time of the sanctions hearing. Beyond pure surmise, there was no indication that Barrera was under contract with any law enforcement agency, and neither Gibson's nor the trial court's speculation throughout the proceedings constituted evidence that the State had willfully failed to disclose information as ordered. The record does not reveal that the prosecutor's conduct was a calculated effort to frustrate the defense. *See Oprean*, 201 S.W.3d at 728. Having considered the prosecutors' statements and actions, we conclude the State's conduct was not willful. *Id*.

21

Because we conclude the State's conduct in failing to comply with the trial court's discovery order was not willful, the trial court's order suppressing all of the State's evidence in its case against Sanchez was error and constituted an abuse of discretion. *Dixon*, 206 S.W.3d at 590; *see also Jackson v. State*, 17 S.W.3d 664, 673 (Tex.Crim.App. 2000) (recognizing distinction for imposing harsh sanction of excluding evidence when State reveals requested information in time for use at trial, and holding defendant was not prejudiced by State's failure to comply with the trial court's discovery order), *citing Smith v. State*, 779 S.W.2d 417, 431 (Tex.Crim.App. 1989) (where State violated discovery order to disclose in advance of trial its favorable arrangements with witnesses, defendant was not denied a fair trial as the State disclosed its deal with witness on direct examination, and wholesale exclusion of witness's testimony was unjustified sanction). The State's issue on appeal is sustained.

## CONCLUSION

The trial court's order granting Sanchez' motion for sanctions and suppressing all of the State's evidence is reversed, and the case is remanded to the trial court.

GUADALUPE RIVERA, Justice

May 16, 2014

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rodriguez, J., concurs in judgment only

(Do Not Publish)

22