**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00248-CR**
_____

**BALTAZAR FUENTES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-05-05624-CR**

**MEMORANDUM OPINION**

Appellant Baltazar Fuentes ("Fuentes" or "Appellant") appeals his conviction for aggravated sexual assault of a child, a first-degree felony. *See* Tex. Penal Code Ann. § 22.021(a)(2)(B). Fuentes complains the trial court erred in permitting expert testimony that allegedly bolstered the complaining witness's testimony and invaded the province of the jury by testifying that the complaining witness was truthful. Fuentes further complains that the trial court erred by refusing to grant a directed

1

verdict on the matter of penetration, since he claimed the evidence negated it. We affirm the trial court's judgment.

## BACKGROUND

A grand jury indicted Fuentes for the offense of aggravated sexual assault of a child, alleging Fuentes "did then and there intentionally or knowingly cause the Defendant's sexual organ to contact or penetrate the sexual organ of A.A., a child who was then and there younger than 14 years of age[.]" *See id.*

The trial was to the jury for both guilt and punishment. After the jury convicted Fuentes of the offense charged and assessed punishment at seventy-five years, the trial court sentenced Fuentes to seventy-five years in the Texas Department of Criminal Justice. We summarize the relevant evidence below.

Officer Joe McGrew's Testimony

After outlining his professional and educational history and his then current duties in the Conroe Police Department, Officer McGrew ("McGrew") explained that from 2017 to 2022, he was a detective in the juvenile division. In the juvenile division, McGrew "would investigate cases that had any juvenile as a suspect or as a victim[,]" including sexual assaults of children. McGrew estimated that he had investigated "[a]bout 500[]" cases in his capacity as a detective in the juvenile division. He described the process of handling a juvenile case, recalling that the initial step is scheduling the victim for a forensic interview. According to McGrew,

2

a forensic interview is "an interview with a child victim . . . in such a way as to try to minimize any secondary victimization and get the child's story without leading them to say any particular thing." McGrew also requested a SANE examination,[1] but it was not conducted because Father refused it. McGrew agreed that a SANE examination is extensive and invasive. McGrew further noted that at the time they executed the search warrant, "[i]t would have been weeks or months[]" since the previous incident of abuse against Ava,[2] and McGrew therefore would have expected that any biological evidence found on the sheets in the primary bedroom would have been traceable to Fuentes and his wife, Mother, rather than to Fuentes and Ava. Ava was, in McGrew's estimate, about twelve to fourteen years old at that time.[3] Following his usual procedure in such cases, McGrew scheduled and observed Ava's forensic interview, during which Ava disclosed details of an offense against her and identified Fuentes as the offender. McGrew then spoke to Father, subpoenaed Ava's school records, and obtained a search warrant for a house occupied by Fuentes, Mother, and Ava. While crime scene investigators were

---

[1] SANE stands for sexual assault nurse examination.

[2] We use a pseudonym to refer to the complainant, a minor, and we refer to her family members other than Fuentes by their relationship to the complainant to protect her privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[3] Ava's birth certificate, admitted as State's Exhibit 4, shows she was twelve when McGrew began his investigation.

3

executing the search warrant, they located a spiral notebook containing Ava's journal entries. Excerpts of the notebook were admitted as State's Exhibits 21 through 25 and are addressed below.

Since Fuentes was at the house while officers were present, McGrew interviewed Fuentes, who denied Ava's accusations, but stated that he had known of Ava's allegations for "two or three years." Fuentes acknowledged that he gave Ava a massage, and claimed that Ava "had solicited him to have sex, specifically saying, 'Stick it in.' And he replied, 'No, that would hurt you.'" McGrew found Fuentes's statement odd because he did not "believe that would be typical of the response of somebody that was presented with a child asking them for sex."

Father's Testimony

Father testified that he and Mother were never formally married, they were together for "many years[]" before separating when Ava was about four or five years old. Father described the custody arrangement between himself and Mother as seeing Ava about once a month during the school year and the entire summer when school was out of session.

After Father graduated from college with a degree in engineering, he worked in Lubbock for a time before moving back to the Houston area so that Ava could live with him instead of with Mother and Fuentes.

Father recalled that Ava's disclosure to him occurred at the end of a weekend visitation in early October 2021. Father "asked [Ava] to gather her things so [Father] could take her back to her mom's place[,]" and while they were in the car, Ava began "bawling, crying[,]" and told him "that her stepfather had touched her." Based on what Ava told Father that day, Father did not return Ava to Mother's home but instead called the police and later took Ava to a forensic interview. Father explained that he declined the SANE examination because he did not "want someone else touching her[,]" despite the difference between a SANE examination and sexual assault.

Julie Pilgrim's Testimony

Julie Pilgrim ("Pilgrim"), a forensic interviewer at Children's Safe Harbor, a children's advocacy center in Conroe, described the purpose and procedure for conducting a forensic interview. Specifically, Pilgrim explained that a forensic interview consists of six stages and is designed to reduce the number of times a child must relate the abuse. In Pilgrim's words, "[i]t decreases suggestibility, and it provides just a neutral environment for the child and their family." Pilgrim also testified about her education, training, and experience, and elaborated on the individual stages of a forensic interview.

In the initial stage of a forensic interview, preparation, Pilgrim ensures that the room is ready, recording is operable, meets with the team to discuss the case, and

reads the report, if one is available. The next stage, rapport building, includes getting to know the child and "establishing comfort[]" by "asking things they like to do for fun[.]" Speaking with the child in this way, enables Pilgrim to assess the child's developmental level and determine "the types of questions [the child is] capable of answering." She then does "event narrative practice" where she shows the child how she might ask something later.

The next stage of the interview is called rules and truth/lie oath. This stage includes letting the child know that she should not guess at the answer to a question and that she should correct the interviewer if necessary. Pilgrim also has the child explain what truth and lie mean to them and goes over examples of truth and lies. Pilgrim then explains the consequences of lying and has the child promise to tell her the truth.

Introducing the topic of concern is the next interview stage. In this stage, Pilgrim asks the child what she came to talk about, and if the child discloses abuse, Pilgrim proceeds to the next stage: detail gathering. During the detail-gathering stage, Pilgrim asks "very open-ended questions[]" and obtains additional detail by asking "who, what, when, where[]" questions, such as "where were you when that happened."

Before the final interview section, closure, Pilgrim leaves the room to ask observers whether she should ask additional questions. She then concludes the interview and escorts the child back to the front area of the facility.

When asked about disclosure, Pilgrim replied that since each child has a different personality and is in different circumstances, the disclosure process is different for each child. Despite these differences, however, Pilgrim identified five stages of disclosure: denial, tentative, active, recant, and reaffirmation. Pilgrim further explained a delayed disclosure as "where a child may wait years and years before they tell someone they've been a victim of abuse." She attributed such delays to any number of causes, including threats, fear, or embarrassment. In Pilgrim's experience, children eventually disclose to make the abuse stop or to prevent abuse of a potential future victim, such as a sibling or cousin. She also noted that it is common for the victim's family to disbelieve the victim's abuse accusation, since the family members think the child may be confused or cannot "imagine that person doing those things that they've heard[.]"

Pilgrim recalled that she conducted Ava's forensic interview at Children's Safe Harbor in October 2021. During the interview, Ava established that she knew the difference between the truth and a lie and promised to tell the truth. Ava described to Pilgrim an incident when she and Fuentes were in Mother's bedroom. Both Ava and Fuentes were nude, and Ava was lying on the bed "on her back[.]"

7

Ava reported Fuentes "was standing up basically next to the bed in front of her[,]" with Ava's "legs . . . resting on his shoulders[]" and Fuentes's hands on Ava's thighs. Ava told Pilgrim that Fuentes "had his penis on her vagina and was moving back and forth kind of - - she used the word gliding as well." Ava stated that Fuentes was gliding "in between both of the lips" of her vagina. Ava then stated that Fuentes "got his hands off of me and grabbed his penis and tried to insert it." Ava recalled that she "could feel the tip trying to go in[,]" and stated that "[i]t hurt a lot." Ava then used her legs to push Fuentes off her. Fuentes hit the dresser but then repositioned Ava's legs on his shoulders and continued "doing the same thing back and forward. And then after that he just stopped." Ava then took her clothes into the bathroom, dressed, and waited in the bathroom until she heard Mother.

Ava's Testimony

Ava testified that she was fourteen years old at the time of trial. Her half-brother and half-sister were then seventeen and six years old, respectively. Ava testified that she liked mathematics, enjoyed playing basketball, and hoped to become a doctor or a lawyer. Although she had a boyfriend in seventh grade, she was not sexually active with him.

Ava recalled meeting Fuentes when she was five years old and stated that they would do things as a family, such as shopping, eating meals, and watching television. Although Ava considered things normal at first, when she was about eight, she

8

"noticed a difference in how [Fuentes] would treat [her]." In particular, Ava believed that Fuentes began to treat her more harshly than her siblings, and she testified that Fuentes's behavior became increasingly sexual toward her.

According to Ava, Fuentes "started being, like, kind of, like, friendly, like touchy. And it started off with, like, kissing." At one point, when Ava was about eight, Fuentes "forced [her] towards him[,]" asked for a kiss, and kissed Ava on the mouth, which she described as "[a]wkward." Other times, Fuentes "smacked and grabbed [Ava's] behind[]" as she walked past him and massaged her back. Ava described his massages as "just, like, massaging[]" at first, but recalled that Fuentes later "put his hand in [my] shirt, like, from the side[]" and rubbed her breast.

When Ava was in about fourth grade and Mother and Ava's siblings were not at home, Fuentes "came in from outside and he asked [Ava] to pull down [her] pants." She did so, and Fuentes then lowered Ava's underwear and rubbed her vagina with his hand for about five minutes. This encounter ended when Ava's friend came to the house to invite Ava to a playdate.

Another time that Fuentes and Ava were at home by themselves, Fuentes asked her to go into her parents' room. Fuentes then pushed Ava onto the bed and told her to remove her pants. Ava recalled that she was lying on her back with her legs hanging off the bed. Fuentes then rubbed Ava's vagina, removed his own pants, and rubbed his penis "back and forth[]" against her vagina. According to Ava,

9

Fuentes then placed her legs on his shoulders and tried to put his penis into her vagina, but she kicked him away. She stated that although his penis contacted her vagina, it did not penetrate it. Ava then "grabbed [her] clothes from the floor and" waited in the bathroom until Mother returned home.

Another time, Fuentes rubbed Ava's breast and vagina outside her clothing. Ava remembered that she was angry because she was powerless to stop Fuentes. In her words, "I didn't know what to do when he was like - - I didn't know if he would have hurt me or something." When Ava was about nine years old, Fuentes showed Ava lubricants and a vibrator belonging to Mother, but he did not attempt to use either of these products on Ava. Fuentes further tried to show Ava pornography, but was unable to do so because he did not have the password to unlock this content.

Although Ava told Mother of some of Fuentes's inappropriate conduct, Mother did not believe Ava, and Fuentes sounded angry that Ava had reported his abuse. Ava testified that Fuentes's abuse continued, and she began cutting herself "because [she] wanted to kill [her]self[]" due to the abuse and Mother's disbelief.

When Ava was twelve, she disclosed Fuentes's abuse to Father at the end of a weekend visit with him. Although the weekend began "just like a normal weekend where [Ava] would spend time with" Father, she later came to understand that Mother did not want Ava living with her anymore. Ava became angry that her "own

mother didn't want [her]," and disclosed Fuentes's abuse so Fuentes would go to prison and thus be unable to abuse Ava's half-sister.

When asked about specific text messages and social media posts, Ava explained that one post was about a boy and had nothing to do with Fuentes. Ava denied that Father had held a knife to her chest and further denied having sent Mother a text message saying otherwise but acknowledged that she told Mother by text message that she wanted to come home.

Dr. Danielle Madera's Testimony

After the trial court conducted a hearing outside the jury's presence, defense counsel objected to Dr. Madera ("Madera") "being allowed to testify as an expert." The trial court overruled this objection, finding that Dr. Madera "ha[d] the qualifications, expertise in this area, that the subject matter of the testimony is an appropriate one for expert testimony. And admitting the expert testimony would assist the fact finder in deciding this case."

Madera outlined her educational and professional qualifications, which include a doctoral degree and her then current position as "a licensed psychologist as the clinical director at one of the Harris County juvenile probation department's post-adjudicated facilities." She also has experience as a forensic interviewer and has provided "expert court testimony in child sexual abuse cases and human trafficking cases in" both Harris and Montgomery Counties on many occasions.

11

Although Madera did not meet with Ava or Mother to prepare to testify, she reviewed the police report, Ava's forensic interview, Mother's police interview, and Ava's journal entries and counseling records. Madera testified in general terms about categories of behavior of children who have been victims of sexual abuse, noting that children vary with age, gender, and cognitive ability. By way of example, she testified that a child who was once fondled by an uncle is "completely different" from a child that's been sexually abused weekly for two years. She noted that depression, the first category, may present as sadness and withdrawal, to self-harm, to anger and fighting. The next category, anxiety, may include post-traumatic stress disorder, with symptoms ranging from hypervigilance to flashbacks and nightmares. Interpersonal difficulties, the third category, results from a breach of trust, and makes it difficult to make and maintain relationships with both peers and family members. The fourth category, sexualized behavior, is "most indicative of sexual abuse[.]" Madera described such behavior as including masturbation and "[k]nowledge of sexual activity that's well beyond their year[s] that they should have no access to."

Madera testified that although no specific behavior identifies a child as a sexual abuse victim, "a cluster of these behaviors or symptoms" are usually seen in children who have been sexually abused. According to Madera, Ava's records

12

showed evidence of each of the four behavioral categories she described. Madera specifically mentioned cutting and self-harm.

When asked to tell the jury about grooming, Madera described it as "any behavior that's taken by the perpetrator with the goal of befriending the child and creating that emotional connection and lowering the child's inhibitions to later sexually abuse that child." Grooming may include "tickling, wrestling, any means to have your hands on a child where you, like, later gradually increase that behavior." It may also include "walking out with no clothes on" or driving a wedge "between the child and their parent with the goal of discrediting that child so if and when they do disclose, that parent is less probable to believe the child."

Madera then recounted the disclosure process, observing that disclosure is "more often than not" delayed. Madera testified that "one of the largest barriers [to disclosure of abuse] is having a non-believing caregiver." She continued, noting that when younger children delay disclosing their abuse, that delay "can be [due to] a lack of awareness of their bodies, not having the language, or not even understanding that what's happening is wrong yet because maybe nobody's talked to them about sex[.]" Blaming the victim is another barrier to disclosure. Conversely, however, an environment where the victim feels safe, heard, and understood fosters disclosure. According to Madera, it is common for a child of divorced parents to disclose to the

non-custodial parent "if [] they have a good relationship with that parent but also if you have a non-believing parent in your primary home."

Madera noted that the initial disclosure usually includes only partial information about the abuse, since the child is "testing the waters[]" to "gauge the reaction" of the person to whom the child disclosed. According to Madera, when there are multiple instances of abuse occurring over a long time period, an abused child may not recall details consistently or may blend or forget some details of abuse. Consequently, children often "will remember the first incident, possibly the last one, and anything in between that would have stood out to them for whatever reason."

Mother's Testimony

Mother testified that she has known Fuentes for about ten years, and they have been married for eight of those years. Mother has three children: her seventeen-year-old-son; her daughter, Ava; and her six-year-old daughter. According to Mother, Fuentes had a "very good reputation[]" in the community and was a truthful person. Mother further testified that Fuentes has never lied. In Mother's opinion, Ava had a reputation as "a loving child[,]" but "[s]he can lie sometimes."

Mother testified that on July 25, 2022, she texted Ava to get an explanation of what happened. During that text message exchange, Mother and Ava discussed Fuentes as follows:

[Mother]:    Why did you lie? He never hurt you.

14

[Ava]:      Ok and.

[Mother]:   If he did why is he not in jail?

[Ava]:      I don't want to talk about it anymore.

[Mother]:   He never had sex with you. CPS told me everything.

[Ava]:      I know he didn't with me. I never said he did.

[Mother]:   One day we will have to talk about it.

When asked about other portions of her text exchanges with Ava, Mother denied but then acknowledged that Ava stated multiple times that Fuentes had touched her and that she was not comfortable at Mother's home.

Mother also denied that Ava told her Fuentes touched her, Ava, inappropriately, but after initially denying it, she acknowledged calling Father's mother during the weekend of October 3 to discuss where Ava would live. She denied telling Father's mother that Ava was trying to seduce Fuentes, but when asked about an interview, Mother conceded that the videotape of the interview would be accurate.

Mother testified to some of Fuentes's statements to her. She testified that Fuentes told her he caught Ava going through Mother's belongings and finding lubricant, and that he explained its use to Ava. Fuentes also may have allowed Ava to watch pornography, apparently telling Ava "[i]f that's what you think you want to watch, if that's what you want to watch, go ahead[,]" before leaving the room.

According to Mother, Fuentes told her that Ava came on to him multiple times, and that Ava once solicited sexual intercourse with Fuentes by lying on Mother's bed naked and telling Fuentes to "stick it in[.]"

Although Mother testified that she had "never been sexually abused," she later admitted that she had, in fact, wished someone had believed her when she was twelve years old and "was in a possibility of a situation like that when [she] was younger." Mother's parents learned of the situation but failed to protect Mother because they were too afraid to report it to law enforcement.

Other Evidence

The record contains portions of Ava's journal, as well as text message exchanges and McGrew's videotaped interview with Fuentes. It also contains her school records.

In her journal, Ava wrote:

I really need someone to talk to. I've been thinking about it for a while now. I really wanna go away from home and go live with a friend. I'm tired of it at home i'm fed up. I don't feel safe or comfortable in my own home anymore. Or in May after my dad graduates (hopefully) I will go live with him, well I will try. Now that I'm 12 I get to choose who I wanna live with. Hopefully I do. If I keep living w/my mom I don't think I'll make it past the year 2021 or the age of 12.

There's times I just wanna scream let everything out. It's hard. You know? Like what can I do to calm myself down? And then there's times I get brain overloads like when I broke the pencil I needed the urge to do something. And then when I was at school I calmed myself through a vape but I want to do something legal. But I don't know. It's hard. Writing down everything un-ravels my brain. For example when my

16

brain is all jumbled writing down my thoughts is like sorting it out. It seperates everything so I can think clearly until I get another overload then the cycle repeats over and over and that's when I lose it and the negative comes in. Then that's were my addiction comes in and thoughts of suicide or self harm.

Ava then identified a chart where she appeared to rate her feelings and made notes about her emotional state. Ava made numerous entries in her chart over several months detailing her emotional states indicating depression, reporting cutting herself a number of times, and even her feelings about suicide.

Directed Verdict

At the close of the State's case, Defendant's counsel moved for a directed verdict, arguing that there was insufficient "competent evidence to proceed" regarding "the manner and means of penetration. So first I would like for a directed verdict as to the entire charge. If you decline that, I would like you to consider a directed verdict regarding the manner and means of penetration." The trial court denied the motions, stating "that the scintilla of evidence regarding that penetration has been met[.]"

**STANDARD OF REVIEW AND APPLICABLE LAW**

We review the denial of a directed verdict as a challenge to the sufficiency of the evidence. *See Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016). Evidence is sufficient to support a conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v.*

17

*Virginia*, 443 U.S. 307, 318–19 (1979); *see also Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). The applicable elements of aggravated sexual assault are:

> (a) A person commits an offense:
>     (1) if the person:
>     . . .
>     (B) regardless of whether the person knows the age of the child at the time of the offense, intentionally or knowingly:
>     (i) causes the penetration of the anus or sexual organ of a child by any means;
>     . . .
>     (iii) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor[.]

Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (iii).

"Child" is defined as "a person younger than 17 years of age." *Id.* § 22.011(c)(1); *see id.* § 22.021(b)(1). The statute does not define the terms "penetrate," "sexual organ," or "contact," so we construe them "according to common usage." *Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015) (addressing the definitions of "penetration" and "female sexual organ"); *see also* Tex. Gov't Code Ann. § 311.011 (a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). Without contact, there can be no penetration. *See French v. State*, 563 S.W.3d 228, 235 (Tex. Crim. App. 2018) (noting that penetration subsumes contact) (citation omitted).

We review a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim.

App. 2010), addressing the admissibility of expert testimony. A trial court abuses its discretion if its ruling falls outside the zone of reasonableness, and we will not reverse the ruling unless the trial court acted without regard to guiding rules or principles. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (referencing "the zone of reasonable disagreement"); *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (referencing the abuse-of-discretion standard). "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party[.]" Tex. R. Evid. 103(a); *Pointe v. State*, 371 S.W.3d 527, 534 (Tex. App.—Beaumont 2012, no pet.) (citing Tex. R. Evid. 103(a)). A party will fail to preserve error if his trial complaint does not comport with his appellate complaint. *See Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017) ("Because the complaint on appeal does not comport with either of the trial objections, nothing is presented for review."); *Sartin v. State*, 680 S.W.3d 663, 670 (Tex. App.—Beaumont 2023, no pet.) (holding that the appellate argument was waived because it did not comport with her trial objections).

## ANALYSIS

### The Motion for Directed Verdict

Fuentes's second issue challenges the trial court's denial of his motion for a directed verdict on the matter of penetration, which Fuentes bases on Ava's testimony that Fuentes did not penetrate her vagina with his penis. Although this

argument accurately reflects Ava's testimony, it disregards the fact that the court's charge to the jury permitted the jury to convict Fuentes if it found that Fuentes "intentionally or knowingly cause[d] the penetration of the sexual organ of the child by the sexual organ of the actor by any means or cause[d] the sexual organ of the child to contact the sexual organ of another person, including the actor[.]"[4] In other words, since the jury charge referenced alternate methods of committing the offense charged, the jury could convict Fuentes upon a finding that his sexual organ contacted Ava's sexual organ, regardless of the alleged absence of penetration. *See Santee v. State*, 247 S.W.3d 724, 728–29 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (discussing contact versus penetration).

In *Santee*, our sister court confronted a similar argument: the appellant contended that he had not penetrated the complainant's sexual organ but was convicted of contacting or penetrating the complainant's sexual organ. *See id.* at 726–29. In affirming the conviction, the *Santee* court held that the disjunctive jury charge did not allow the appellant to be convicted with a less than unanimous verdict, since "'penetration of the genitals necessarily includes contact.' Thus, a jury that finds a defendant guilty of penetration of the sexual organ necessarily has determined unanimously that the defendant made contact with the sexual organ." *Id.*

---

[4] The charge also references the victim's age at the time of the offense, but it is not disputed that Ava was under fourteen years old at the times of the acts alleged.

at 728. (citation omitted). Although Santee complained about the jury charge and Fuentes complains about the sufficiency of the evidence, *Santee* nonetheless informs our opinion in this case, since both Santee and Fuentes base their appellate arguments on an alleged lack of penetration. *See id.* at 728–29.

Assuming without deciding that some jurors convicted Fuentes on the basis of penetration while other jurors convicted Fuentes on the basis of contact without penetration, the rationale of *Santee* supports affirming Fuentes's conviction regardless of penetration, since there can be no penetration without contact. *See id.* Forensic examiner Julie Pilgrim testified that Ava told her during the forensic interview that Ava "could feel the tip [of Fuentes's penis] trying to go in[,]" and stated that "[i]t hurt a lot." In her trial testimony, Ava stated that Fuentes put his penis on her vagina and then he tried to "put it in...[t]o, like, the hole in my vagina." In short, the record contains evidence of genital contact sufficient to support the conviction, and further evidence of penetration is not required. *See id. See Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992) (penetration proven where victim testified defendant touched outside of vagina with finger and pressed down until it hurt, and medical examination revealed healing wound within folds of outer lips but outside of vaginal canal); *see also Guevara v. State*, 667 S.W.3d 422, 442 (Tex. App.—Beaumont 2023, pet. ref'd) (As discussed, with exceptions not

applicable here, the testimony of a single eyewitness can support a defendant's conviction.). We overrule Fuentes's second issue.

Admission of Madera's Testimony

Turning to Fuentes' first issue, at trial Fuentes, through his counsel, objected to Madera's testimony, stating "[f]or the record, I would object to her being allowed to testify as an expert." In his first appellate issue, Fuentes argues that the trial court erred in admitting Madera's testimony, because her testimony purportedly "was meant to bolster the testimony of one of the State's witnesses, and where the Expert's testimony was used to decide facts that were solely the Jury's decision to make[.]"

There are three types of objections that can be made to expert testimony: 1) Rule 104(a) requires a preliminary determination by the trial court concerning the qualifications of the expert to be an expert witness; 2) Rule 702 requires the trial court to determine "If scientific, technical, or other specialized knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise; and 3) Rules 401 and 402 allow testimony only if "it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Vela v. State*, 209 S.W.3d 128, 130–31 (Tex. Crim. App. 2006). In order to preserve error on any one or more of these bases, a specific objection must be made at trial on such basis.

22

Fuentes's trial court objection was not sufficiently specific as to which of these three objections he was bringing when he objected to the "testimony" of Madera. In order to make the trial court aware of the complaint and the basis of his objection it must be apparent from the context of the objection found in the record, if any. *See* Tex. R. App. P. 33.1(a)(1)(A) (requiring the objection to be specific); *see also Clark v. State*, 365 S.W.3d 333, 336–40 (Tex. Crim. App. 2012) (addressing the requirements that objections be specific). In affirming the appellant's conviction, the *Clark* court stated, "[t]he two main purposes of requiring a specific objection are to inform the trial judge of the basis of the objection so that he has an opportunity to rule on it and to allow opposing counsel to remedy the error." *Id*. at 339 (citation omitted). "'To avoid forfeiting a complaint on appeal, the party must let the trial judge know what he wants, [and] why he thinks he is entitled to it[.]'" *Brown v. State*, 296 S.W.3d 371, 386 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). Although Fuentes let the trial court know what he wanted, for Madera's testimony to be excluded, he did not advise the trial court why he allegedly was entitled to that relief. Fuentes therefore forfeited his challenge to Madera's testimony. *See Brown*, 296 S.W.3d at 386. *See also Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.— Houston [14th Dist.] 2010, pet. ref'd) (cleaned up) (The three requirements raise distinct questions and issues, and an objection based on one of these requirements does not preserve error

as to another. Similarly, if a party objects to expert testimony without identifying one or more of these issues, no error is preserved for our review).

A specific objection is unnecessary when the basis of the objection is "obvious to the judge and opposing counsel[.]" *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). The basis of Fuentes's objection, however, was not, since there were no "statements or actions on the record that clearly indicate[d] what the judge and opposing counsel understood the argument to be." *Resendez v. State*, 306 S.W.3d 308, 315–16 (Tex. Crim. App. 2009). Fuentes's objection to Madera's testimony as a whole could have challenged Madera's expertise or the bases of her professional opinions and was not necessarily aimed at the content of her testimony as bolstering Ava's testimony or invading the province of the jury as factfinder and arbiter of witness credibility. *See Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) (reiterating the jury's role as factfinder and sole judge of witness credibility).

In addition, since Fuentes's objection at trial does not comport with his argument on appeal, nothing is preserved for our review. *See Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986); *see also Ford v. State*, 488 S.W.3d 350, 351 (Tex. App.—Beaumont 2016, no pet.).

For the reasons set forth above, we overrule Fuentes's initial appellate issue.

# CONCLUSION

Having concluded the evidence was sufficient to support Fuentes's conviction and that Fuentes failed to preserve error as to Madera's expert opinion testimony, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on May 1, 2025
Opinion Delivered July 30, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.